**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Carlos RODRIGUEZ–SANCHEZ,**
**Defendant–Appellant.**

**No. 93–50198.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 8, 1994.

Decided May 3, 1994.

---

Terry R. Kolkey, Vista, CA, for defendant-appellant.

Barbara L. Major, Asst. U.S. Atty., San Diego, CA, for plaintiff-appellee.

Before: WIGGINS and NELSON, Circuit Judges and REED,* District Judge.

Opinion by Senior District Judge REED

EDWARD C. REED, Jr., Senior District Judge:

Carlos Rodriguez–Sanchez was found guilty of possessing methamphetamine with the intent to distribute it under 21 U.S.C. § 841(a)(1). Mr. Rodriguez–Sanchez appeals from conviction and the sentence imposed. Mr. Rodriguez–Sanchez argues that his stop

* Honorable Edward C. Reed, Jr., Senior United States District Judge for the District of Nevada, sitting by designation.

and detention lacked reasonable suspicion and evidence discovered as a result should have been suppressed. The district court, Keep, J. presiding, denied the motion to suppress. On this basis Mr. Rodriguez–Sanchez appeals his conviction.

The sentencing court, Rhoades, J. presiding, sentenced Mr. Rodriguez–Sanchez under 21 U.S.C. § 841(b)(1)(A) which mandates a minimum ten year sentence for "violation[s] of subsection (a) of this section involving ... (viii) 100 grams or more of methamphetamine." Sentence was based on the entire amount of methamphetamine, over 100 grams, not merely the amount Mr. Rodriguez–Sanchez claims he intended to distribute. Mr. Rodriguez–Sanchez claims he intended to distribute less than 100 grams. On this basis he appeals the sentence imposed.

## FACTS AND PROCEEDINGS BELOW

On January 22, 1992, at approximately 7:45 A.M., Rodriguez–Sanchez drove a friend's Monte Carlo automobile northbound through the Temecula border patrol checkpoint located on California Interstate 15. Border Patrol Agent Nicodemus was observing the northbound traffic pass through the checkpoint, and at that time observed Rodriguez–Sanchez drive past while the owner of the Monte Carlo, Mr. Richard Borrego, sat in the passenger seat. A number of observations focused the agent's attention on this vehicle. The time of day, coinciding with morning commuter traffic and change of shift for Border Patrol officers is the favored time of day for smugglers to bring illegal aliens into the United States on this route. Furthermore, California Interstate 15 has a high volume of illegal alien smugglers. Initially, the agent observed two males of latin descent driving a Monte Carlo, a car known to the agent to be commonly used in border violations due to its large size and low cost. The agent further observed both men appeared rigid and that they stared straight ahead, making no eye contact. Additionally, the driver's arms were locked and gripped the steering wheel in an odd or unnatural manner. As the car passed

through the checkpoint, traffic in general sped up as it went from two lanes to four. The Monte Carlo accelerated more aggressively than other cars and made several rapid lane changes as it accelerated, passed cars and exited the area rapidly.

Agent Nicodemus became suspicious and entered traffic to follow the vehicle. After catching up with the Monte Carlo, the agent pulled in behind it and Rodriguez–Sanchez immediately slowed down. The agent then pulled up alongside Rodriguez–Sanchez's, the driver's, side of the Monte Carlo, maintained this position for five to six seconds and continuously looked over at Rodriguez–Sanchez. Neither of the occupants of the Monte Carlo returned the agent's glances. They maintained their rigid posture and gazed straight ahead. The agent then pulled slightly ahead of the Monte Carlo so that he could look back at Rodriguez–Sanchez in an attempt to draw his attention and recognition. Neither of the Monte Carlo's occupants responded in any way. In Agent Nicodemus' experience, such behavior was unusual and had a high correlation to illegal activity.

At this time, Rodriguez–Sanchez very abruptly exited to the right onto the Highway 79 exit ramp. This maneuver required Rodriguez–Sanchez to cross two lanes of traffic, and to cut off cars behind him. Despite exiting at the last second from an inner lane, Rodriguez–Sanchez did not look for cars around him nor had he been looking for road signs or markers. Agent Nicodemus testified that the manner in which Rodriguez–Sanchez exited indicated an evasive maneuver and not normal driving behavior. The agent then believed he had reasonable suspicion that a border violation existed and activated the emergency gear, at which time Rodriguez–Sanchez pulled over onto the side of the exit ramp.

Pursuant to the stop, both occupants of the car were arrested and a search of the car later revealed a bag of methamphetamine hidden in the dashboard. The methamphetamine had a gross weight of 294[1] grams

---

**1.** There is some confusion as to the amount of methamphetamine substance contained in the package. The Presentencing Report determined

that 294 grams of methamphetamine mixture was involved. The original and superseding indictment charged 294 grams of methamphet-

containing at least 113 grams of pure methamphetamine. An agent testified at trial that this quantity indicated it was probably for distribution.[2] During questioning Rodriguez–Sanchez admitted he had placed the bag behind the dashboard and claimed he intended to share some of the methamphetamine with friends but did not intend to sell any and intended to keep the remainder for personal use.

Rodriguez–Sanchez stated that he came to possess the methamphetamine by happenstance. While getting gas, he observed two people fighting, one of whom dropped a bag which Rodriguez–Sanchez pocketed. That bag happened to contain the methamphetamine at issue. This all occurred the night before his arrest.

A pre-trial motion to suppress evidence found as a result of the original stop, including the bag of methamphetamine, was made on the basis that the agent had no reasonable suspicion for stopping Rodriguez–Sanchez. The motion was denied. The court viewed the evidence in the totality and found the agent did have reasonable suspicion to justify the stop.

A jury returned a guilty verdict for possession with intent to distribute. Rodriguez–Sanchez testified that he was a small time user but never a dealer of methamphetamine. Rodriguez–Sanchez also indicated he didn't know the exact quantity of methamphetamine in the bag and had not come to any definite intent regarding what to do with it, but intended generally to distribute only a very small amount to friends.

Rodriguez–Sanchez argued to the sentencing court that the evidence indicated he intended to distribute much less than 100 grams of methamphetamine and the sentence imposed should reflect that intent. Specifically, Rodriguez–Sanchez argued that the sentencing provisions of 21 U.S.C. § 841(b)(1)(A) contemplate basing sentence only on the amount of drug which a defendant actually intended to distribute and not on the entire amount possessed, where a defendant intends to distribute only a part of the whole.

Section 841(b)(1)(A) states that

(1)(A) In the case of a violation of subsection (a) of this section **involving**—

(viii) 100 grams or more of methamphetamine ...

such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life....

21 U.S.C. § 841(b)(1)(A) (emphasis added).

Rodriguez–Sanchez's argument is that a violation of § 841(a)(1) for possession with intent to distribute **involves** only that quantity of drugs intended for distribution and not any quantity possessed for personal use.

---

amine mixture. However, the parties stipulated at trial that 182.5 grams of methamphetamine were contained in the package. Evidence was introduced at trial that the methamphetamine mixture contained approximately 62% pure methamphetamine. 182.5 is approximately 62% of 296. Thus it appears the 182.5 quantity refers to the quantity of pure methamphetamine. The sentencing court determined the package contained 113 grams of pure methamphetamine and based sentence on that figure. 113 is approximately 62% of 182.5. The trial court may have thought the 182.5 gram figure referred to the gross weight of the methamphetamine mixture and determined that the amount of pure methamphetamine at 113 grams.

It appears there was either 296 grams of a methamphetamine mixture containing 62% or 182.5 grams of pure methamphetamine or a 182.5 grams mixture containing 62% or 113 grams of pure methamphetamine.

**2.** The large quantity of methamphetamine possessed by Mr. Rodriguez could itself have supported an inference that the methamphetamine was possessed for distribution. *United States v. Innie*, 7 F.3d 840, 844 (9th Cir.1993) *cert. denied*, —— U.S. ——, 114 S.Ct. 1567, 128 L.Ed.2d 212 (1994); *United States v. Smith*, 832 F.2d 1167, 1170 (9th Cir.1987).

The Sentencing Guidelines contain a table in which the average single unit or dose of methamphetamine is stated to be 5 mg of pure methamphetamine. Sentencing guidelines, § 2D1.1. A quantity of 113 grams of pure methamphetamine contains 22,600 individual 5 mg doses.

Conversely, Agent McClintock testified that 5 mg is a therapeutic dose and that the standard or average dose taken by a drug abuser is approximately 100 mg. Reporter's Transcript pp. 201, 228, 233–35. Agent McClintock further testified that 182.5 grams of methamphetamine would contain 1,825 doses which would last the average user approximately two to two and one-half years. Reporter's Transcript pp. 202, 234–235.

The sentencing court rejected Rodriguez–Sanchez's argument and correspondingly declined to make any findings as to the amount Rodriguez–Sanchez intended to distribute.[3] The court determined all the methamphetamine was **involved** in the violation of § 841(a)(1). This necessarily invoked the ten year mandatory minimum sentence under § 841(b)(1)(A). The court determined the sentencing range under the guidelines at 97 to 121 months and clearly indicated its preference for the low range. However, because sentence was based on 113 grams of pure methamphetamine, the court held it was precluded from sentencing under the guidelines to less than the statutory ten year minimum mandated by § 841(b)(1)(A). Sentence was set at 120 months confinement, the statutory mandatory minimum.

## DISCUSSION

### A. REASONABLE SUSPICION TO PERFORM AN INVESTIGATORY STOP

#### 1. Standard of Review

■ Legal conclusions on motions to suppress evidence are reviewed *de novo*. *United States v. Prieto–Villa*, 910 F.2d 601, 604 (9th Cir.1990). Findings of fact regarding such motions or at hearing are reviewed under a more deferential clearly erroneous standard. *Id.* The specific question of whether reasonable suspicion existed under given facts is a legal conclusion subject to the *de novo* standard of review. *United States v. Hernandez–Alvarado*, 891 F.2d 1414, 1416 (9th Cir.1989).

#### 2. Investigatory Stops May be Made on the Basis of Reasonable Suspicion

■ Brief investigatory stops or detentions by border patrol agents of vehicles in the vicinity of the United States' international borders may be based on reasonable suspicion. *United States v. Brignoni–Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). Reasonable suspicion is not a mere phrase but has been given meaning such that suspicion is "reasonable" only if based on "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle contains aliens who may be illegally in the country." *Id.* at 884, 95 S.Ct. at 2582. The Court listed several factors that might contribute to a finding of reasonable suspicion. *Id.* at 884–885, 94 S.Ct. at 2581–2582.[4]

■ A gloss on this rule prohibits reasonable suspicion from being based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped. *United States v. Rodriguez*, 976 F.2d 592, 596 (9th Cir.1992) opinion amended on denial of rehearing by 997 F.2d 1306 (9th Cir.1993) (amendments not relevant to our discussion). Reasonable suspicion requires that the specific facts and inferences create suspicion "that the particular person detained is engaged in criminal activity." *Id.* at 594 (quotation omitted). Furthermore, we ask whether the listed facts and inferences would "excite the suspicion of a trained border patrol agent that criminal activity is afoot." *Id.*

---

3. The district court made its decision before the recent case *United States v. Kipp*, 10 F.3d 1463 (9th Cir.1993), which we hold dispositive of the sentencing issue, was decided.

4. The Supreme Court explicitly listed several factors, not meant to be exhaustive, upon which Border Patrol officers might rely in reaching reasonable suspicion. *United States v. Brignoni–Ponce*, 422 U.S. 873, 884–885, 95 S.Ct. 2574, 2581–2582, 45 L.Ed.2d 607 (1975). These factors were: (1) characteristics of the area in which vehicle first encountered; (2) proximity to the border; (3) usual traffic patterns on the particular road; (4) previous experience with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, as erratic or obvious attempts to evade officers can support reasonable suspicion; (7) aspects of the vehicle such as size; (8) whether the vehicle is heavily loaded or has numerous passengers; and (9) whether trained officers detect indications that passengers are residents of Mexico from such factors as dress and haircut. Of these factors, all but the last two were present or played some role in Officer Nicodemus' assessment. Only observations regarding how heavily loaded or crowded the vehicle was with numerous passengers and factors indicating the passengers were residents of Mexico were absent. *Id.*

### 3. Reasonable Suspicion Existed to Stop Rodriguez–Sanchez

■ In *U.S. v. Rodriguez,* 976 F.2d 592, the court determined that the facts relied upon to create reasonable suspicion were insufficient. *Id.* In the case at bar, many of the same factors are present and counsel for Mr. Rodriguez–Sanchez strenuously asserts that the cases are nearly indistinguishable. We might have some concern, as did the court in *U.S. v. Rodriguez,* that the evidence supporting reasonable suspicion seems to follow a rote pattern. Here, however, there are several additional factors alleged which are not easily susceptible to such rote recitations. The district court placed some emphasis on these additional factors. This, combined with the other facts, supports reasonable suspicion.

Most significant is Mr. Rodriguez–Sanchez's sudden and abrupt exit from the highway onto an exit ramp. Up until that time, the factors relied upon are nearly indistinguishable from *U.S. v. Rodriguez,* 976 F.2d 592. The facts relied on here and there were:

1. location of the incident on a highway "notorious for alien smugglers;"

2. the lack of acknowledgment or eye contact between the suspect and the agents;

3. a type of car favored by alien smugglers;

4. the ethnicity of the suspects.

In addition, in *U.S. v. Rodriguez,* the car appeared heavily weighed down, and was driven erratically, *id.* at 595, whereas here the agent did not make any such observations. Those factors were insufficient in *U.S. Rodriguez. Id.* at 596.

This incident occurred at a time when alien smuggling peaks—at rush hour and shift change. The driver, Mr. Rodriguez–Sanchez, had his arms locked in an odd manner. The rapid exit from the border checkpoint combined with the weaving in and out of lanes without signalling might give rise to a weak inference that the driver was engaged in illegal activity and wished to leave the border patrol checkpoint as quickly as possible. The agent also testified that the occu-pants of the car were rigid and steadfastly refused to make eye contact.

These additional facts raise the level of suspicion above that which was found lacking in *U.S. v. Rodriguez.* However, if this were all the evidence we would have a very difficult decision.

Mr. Rodriguez–Sanchez further attempted to terminate this police encounter by abruptly exiting the highway. The facts testified to by Agent Nicodemus combined with his training and experience are sufficient to support an inference that this was an evasive maneuver and not merely negligent driving behavior.

Unlike *U.S. v. Rodriguez,* the government does not "tender to us the picture of innocent driving behavior [and] ask us to accept it as signifying criminal behavior to a trained and experienced eye." *Id.* at 596. The abrupt exit from the highway, as described by Agent Nicodemus, appears even to laypersons, to be an attempt to evade contact with law enforcement officials. "[O]bvious attempts to evade officers can support reasonable suspicion." *U.S. v. Brignoni–Ponce,* 422 U.S. at 885, 95 S.Ct. at 2582.

Under the facts before us, finding reasonable suspicion in this case will provide no broad brush enabling border patrol agents to draw into the law enforcement net a large number of people based on innocent behavior. The totality of the circumstances, including particularly the abrupt exit from the highway, constitute "well-founded suspicion based on particular, individualized, and objectively observable factors which indicate that the person is engaged in criminal activity." *Id.* at 596.

The district court's order denying the motion to suppress was correct and the judgment of conviction is affirmed.

### B. SENTENCING UNDER 21 U.S.C. § 841(b)(1)(A) AND THE SENTENCING GUIDELINES, § 2D1.1(c), FOR THE CRIME OF POSSESSION WITH INTENT TO DISTRIBUTE, 21 U.S.C. § 841(a)(1) IS TO BE BASED ONLY ON THE AMOUNT OF NARCOTIC A DEFENDANT INTENDS TO DISTRIBUTE.

### 1. Standard of Review

■ Rodriguez–Sanchez's contention is that the district court erroneously interpret-

ed the sentencing provisions of 21 U.S.C. § 841(b)(1)(A) which led to imposition of a greater sentence than would otherwise have been imposed. Statutory interpretation is a question of law. Questions of law are reviewed *de novo*. *Anderson v. United States*, 966 F.2d 487, 489 (9th Cir.1992).

## 2. Sentence was Based on the Entire Quantity of Pure Methamphetamine Rodriguez–Sanchez Possessed

The district court indicated its sentence was based on its determination that the total amount of pure methamphetamine possessed by Rodriguez–Sanchez was involved in the underlying violation of § 841(a)(1). On this basis, the court sentenced Rodriguez–Sanchez based on the quantity of pure methamphetamine, at least 113 grams, he possessed at the time of his arrest. Consequently, the court was required to sentence Rodriguez–Sanchez to the ten year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A). The court declined to make any factual finding as to the amount of methamphetamine Mr. Rodriguez–Sanchez intended to distribute. Such a finding would have been irrelevant under the district court's determination that the entire amount possessed is "involved" in the violation of § 841(a)(1) and must be considered at sentencing.

## 3. Sentence, Under 21 U.S.C. § 841(b)(1)(A), for Possession with Intent to Distribute is to be Based on the Quantity of Drugs Intended for Distribution

### a. Sentence is Based on Quantity of Drugs *Involved* in the Violation of § 841(a)(1)

The statute under which Rodriguez–Sanchez was sentenced, 21 U.S.C. § 841(b)(1)(A), bases sentence for violations of § 841(a) on the amount of *drugs* **involved** in the underlying offense. 21 U.S.C. § 841(b)(1)(A).

Rodriguez–Sanchez violated § 841(a)(1) for "knowingly or intentionally- . . . possess[ing] with intent to . . . distribute . . . a controlled substance[.]" 21 U.S.C. § 841(a)(1). Although Rodriguez–Sanchez possessed 113 grams of pure methamphetamine, he claims the crime of possession with intent to distribute **involves** only that quantity of methamphetamine he possessed and intended to distribute. Thus, he claims, sentence should have been based only on that quantity of the methamphetamine he possessed which he intended to distribute. Because the district court made no determination regarding the quantity of methamphetamine Rodriguez–Sanchez intended to distribute, Rodriguez–Sanchez claims we must reverse the sentence and remand for such a determination and new sentence to be imposed accordingly.

No court that we are aware of has faced the specific question: is sentencing, under 21 U.S.C. § 841(b)(1)(A), for possession with intent to distribute, to be based only on amounts a defendant intended to distribute.

### b. Drugs Possessed for Personal Use are not Part of the Same Course of Conduct or Common Scheme or Plan as Drugs Intended for Distribution

While no court has addressed this specific question under the sentencing provisions of § 841(b)(1)(A), this Court, has recently faced a similar issue under the sentencing guidelines. *See United States v. Kipp*, 10 F.3d 1463 (9th Cir.1993).

In *Kipp*, this Court heard an appeal from sentence imposed under the Sentencing Guidelines § 2D1.1(c) and § 1B1.3(a)(2) for violation of 21 U.S.C. § 841(a)(1). *Id.* The present appeal is distinguishable because we are faced with an appeal from sentence imposed under the statutory sentencing provision of § 841(b)(1)(A) for a violation of § 841(a)(1) rather than under the guidelines. Thus, the holding in *Kipp* is not binding upon us.[5]

---

**5.** In both *Kipp* and here the defendant was convicted of an underlying violation of § 21 U.S.C. § 841(a)(1). The defendant in *Kipp* however was sentenced under the Sentencing Guidelines. Therefore, the *Kipp* holding does not address the mandatory minimum sentencing provisions of 21 U.S.C. § 841(b)(1)(A) which base sentence on the amount of drugs involved in the underlying violation of § 841(a).

Furthermore, the specific holding of *Kipp* is rather narrow. The Court in *Kipp* merely held that quantities of drugs possessed for personal use are not part of the same course of conduct or part of a common scheme or plan as a violation

In *Kipp*, a district court sentenced a defendant, who had pled guilty to possession with intent to distribute cocaine, under Sentencing Guidelines § 2D1.1(c) and § 1B1.3(a)(2). The defendant pled guilty to a charge of possession of cocaine with intent to distribute it. At sentencing, the defendant admitted possessing 80 to 90 grams of cocaine, but claimed that he intended to distribute only 5 or 6 grams. The district court declined to make a factual finding regarding the quantity of cocaine the defendant possessed for personal use and the amount intended for distribution. The district court "simply [could] not see how those amounts [were] severable," for sentencing purposes and imposed sentence based on the 80 to 90 grams admittedly possessed by the defendant. *Id.* at 1465.

We vacated the sentence imposed and remanded for a factual determination of how much cocaine the defendant possessed for personal use and how much was possessed with the intent to distribute. *Id.* at 1466. When resentencing, we stated that, "the district court must make a factual finding as to the quantity of [drugs] possessed for distribution and cannot include any amount possessed strictly for personal use." *Id.* We held that sentence under the guidelines was to be based on "the quantity of drugs involved in the count of conviction and quantities that 'were part of the same course of conduct or part of a common scheme or plan as the count of conviction.'" *Id.* at 1465, quoting U.S.S.G. § 1B1.3(a)(2).

Under U.S.S.G. § 1B1.3(a)(2) quantities of drugs may be aggregated for sentencing purposes if they "were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).

In *Kipp*, we cited *United States v. Harrison–Philpot*, 978 F.2d 1520, 1522 (9th Cir. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2392, 124 L.Ed.2d 294 (1993), for the proposition that sentence under the guidelines is to be based on the quantity of drugs involved in the offense. *Kipp*, 10 F.3d at 1465. Nevertheless, we did not analyze whether a conviction for possession with intent to distribute under § 841(a)(1) **involves** all quantities of narcotic possessed or only that quantity the defendant intended to distribute.[6] *Id.* We considered only whether drugs possessed for personal use were part of the same course of conduct or common scheme as possession of drugs with intent to distribute them under U.S.S.G. § 1B1.3(a)(2). *Id.* We held that "[d]rugs possessed for mere personal use are not relevant to the crime of possession with intent to distribute because they are not 'part of the same course of conduct' or 'common scheme' as drugs intended for distribution." *Id.*

In *Kipp*, we did not resolve the issue of whether the quantities of drugs possessed for personal use are not involved in the underlying violation of § 841(a)(1) for possession of § 841(a)(1) for possession of drugs with the intent to distribute them.

The specific issue before us does not involve the Sentencing Guidelines nor does it require us to determine whether drugs held for personal use are part of the same course of conduct or part of a common scheme or plan as a violation of § 841(a)(1). The defendant, Mr. Rodriguez–Sanchez, was sentenced under the mandatory sentencing provisions of 21 U.S.C. § 841(b)(1)(A), in which the only basis for sentence is the amount of drugs **involved** in the underlying violation of § 841(a)(1). Therefore, the specific question before us is whether drugs possessed for personal use are **involved** in a violation for possession with intent to distribute.

Accepting that defendant Rodriguez–Sanchez possessed at least 113 grams of pure methamphetamine and that he was found guilty of intending to distribute some portion of that amount, should he be sentenced on the entire quantity possessed or on the quantity remaining after removing from consideration the amount he possessed for his own personal use?

6. After stating that under the guidelines "the district court [is] to calculate the base offense level using only the quantity of drugs involved in the count of conviction and quantities that were part of the same course of conduct or part of a common scheme or plan as the count of conviction[,]" the Court immediately concluded that "[d]rugs possessed for mere personal use are not relevant to the crime of possession with intent to distribute because they are not part of the same course of conduct or common scheme as drugs intended for distribution." *United States v. Kipp*, 10 F.3d 1463, 1465–66 (9th Cir.1993) internal quotations and citations omitted. Missing from this conclusion is any holding that drugs possessed for mere personal use are not relevant to the crime of possession with intent to distribute because they are not **involved** with drugs intended for distribution.

with intent to distribute. That is the question facing this Court today.

**c. Although the Holding of *Kipp* is not Binding, the Principle is Controlling**

We based our decision in *Kipp* in part on the apparent intent of the Sentencing Guidelines to punish distributors of drugs more harshly than consumers and to punish distributors in relation to the quantity of drugs they distributed or intended to distribute. *Id.* at 1466. The same intent permeates 21 U.S.C. § 841(b)(1)(A).

In *Kipp* we specifically rejected application of "a mechanical rule that all of the [drugs] possessed must be considered in sentencing, even if most of it was not held for distribution." *Id.* at 1466. Such a rule would thwart the intent to punish distributors more harshly than consumers of drugs and to make sentence proportional to the amount of harm to society represented by the quantity of drugs to be distributed.

The principle underlying in *Kipp* is persuasive. The district court below similarly held that the methamphetamine Rodriguez–Sanchez possessed was not divisible or segregable into discrete quantities held for personal consumption and held for distribution. Thus, it also mechanically applied all 113 grams of methamphetamine to determine Rodriguez–Sanchez's sentence.

Although the specific holding of *Kipp* is not technically binding upon us, the principle behind that decision guides our decision. We are dealing with the same crime, possession with intent to distribute. The legislative intent behind the mandatory minimum sentencing provisions of § 841(b) are not necessarily identical with those behind the Sentencing Guidelines but they are similar. The mandatory sentencing provisions of § 841(b) do not have the same flexibility as the guidelines yet different minimum sentences are available depending on the amount and type of drugs involved. Thus, some proportionality in sentencing was intended.

Furthermore, § 841(a)(1) does not criminalize mere possession of drugs, only posses-

sion with intent to distribute. 21 U.S.C. § 841(a)(1). Other statutes deal with the crime of possession. *See* 21 U.S.C. § 844. Thus, the crime of possession with intent to distribute focuses on the intent to distribute, not the simple possession. This bolsters our determination that sentence for the crime of possession with intent to distribute should be based only on the amount intended for distribution. Because § 841(a)(1) does not criminalize mere possession, while other statutes do, the emphasis is on the intent to distribute rather than on possession.

Therefore, under the principle established in *Kipp*, we hold that possession of drugs with the intent to distribute them, in violation of § 841(a)(1) **involves**—under § 841(b)(1)(A)—only those drugs which are intended for distribution.

We vacate the sentence imposed and remand to the district court for a factual determination of the amount of drugs Mr. Rodriguez–Sanchez intended to distribute and new sentence to be imposed accordingly. Only such quantity should be used for sentencing.

**C. THE PROCEEDINGS BELOW**

■ We continue in order to give the district court some further guidance as to how to reach its determination on remand. Nothing we discuss should be construed as a finding of fact. The district court on remand shall be free to develop the facts necessary to its determination.

Rodriguez–Sanchez's self-serving testimony regarding how much methamphetamine he intended to distribute will not necessarily be conclusive of that determination. There are several items the district court may consider in reaching its finding aside from Rodriguez–Sanchez's testimony. We discuss some issues here, without any attempt at being exhaustive.

Rodriguez–Sanchez has argued here and to the district court that he had not yet reached any intent, at the time of his arrest, as to any particular quantity of methamphetamine he intended to distribute.[7] If the facts devel-

---

7. In a Sentencing Memorandum and Presentence Report Objection filed August 4, 1992, Rodriguez–Sanchez asserts that he "has stated

that at the time of his arrest he had not yet decided what to do with the crystal. He did not even know how much he had, since he had never

oped below support his claim, Rodriguez–Sanchez can have had no intent to distribute any particular quantity of methamphetamine. This does not mandate a finding that Rodriguez–Sanchez had no intent to distribute any quantity of methamphetamine.

The district court below does not face the relatively easy situation in which a defendant does not know the exact quantity of drugs possessed, but intends to distribute them all. In such a situation the defendant's sentence is based on the entire quantity of drugs possessed. *United States v. Sotelo–Rivera,* 931 F.2d 1317, 1319 (9th Cir.1991) *cert. denied* —— U.S. ——, 112 S.Ct. 1186, 117 L.Ed.2d 428 (1992). Here, Rodriguez–Sanchez neither knew the actual quantity of drugs possessed, nor had he yet formed the intent to distribute any particular quantity or fraction of the package other than the intent to distribute "some."

Rodriguez–Sanchez claims that he intended to distribute only a small portion relative to the entire quantity. Taking Rodriguez–Sanchez's claims at face value, it might be more accurate to state that he intended to distribute that which he could not consume. Under this theory, it would be very important to know the total quantity of drugs possessed and the defendant's own rate of consumption.[8]

Of course all relevant factual questions as to Rodriguez–Sanchez's intent, state of mind, and knowledge regarding the methamphetamine he possessed are for the district court to determine.

---

seen that quantity before. Most likely he was intending to use some and give some away. But, since he did not know how much he had, he would not have yet formulated any intent to distribute a certain quantity." *Id.* at p. 4, ln. 14–20; located in Appellant's Excerpt of Record at p. 13.

**8.** Again, it must be pointed out that 5 mg doses are therapeutic and that the average illicit dose is approximately 100 mg. *See,* note 1 *supra.*

Rodriguez–Sanchez testified that he was using methamphetamine at the time of his arrest, at the rate of approximately 2 grams per week. Reporters Transcript p. 266. At this rate, Rodriguez–Sanchez would have consumed a 294 gram quantity of methamphetamine mixture in 148 weeks or a little under three years. As indicated above there is some confusion regarding the quantity of methamphetamine involved. At this

## CONCLUSION

The judgment of conviction is affirmed. The sentence is vacated and we remand the action to the district court below for resentencing.

AFFIRMED in part, VACATED in part and REMANDED for further proceedings consistent with this opinion.

---

rate, Rodriguez–Sanchez could have consumed a 182.5 gram quantity of methamphetamine mixture in 91 weeks or one year and about nine months. Both results are fairly consistent with Agent McClintock's estimate that the quantity of methamphetamine found on Rodriguez–Sanchez would last an average user between two and two and one-half years.

The preceding analysis was meant merely to demonstrate that the total quantity of drugs possessed and the rate at which they are consumed may be relevant to a determination regarding what quantity a defendant intends to distribute. As the quantity of drugs possessed increases and the rate of consumption decreases it becomes less plausible that a defendant intended to consume the whole quantity. Conversely as quantity decreases and rate of consumption increases a defendant's claim that he or she intended to consume the entire quantity or portion thereof, may be more credible.