**UNITED STATES of America, Plaintiff–Appellee,**

v.

**German Espinoza MONTERO–CAMARGO, Defendant–Appellant.**

**United States of America, Plaintiff–Appellee,**

v.

**Lorenzo Sanchez–Guillen, Defendant–Appellant.**

Nos. 97–50643, 97–50645.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 10, 1998.

Decided May 13, 1999.

Harold Murray, Oden, Greene, Murray & Thompson, San Diego, California, for appellant Montero–Camargo.

Steven F. Hubachek, Federal Defenders of San Diego, Inc., San Diego, California, for appellant Sanchez–Guillen.

Sangeeta G. Patel, Special Assistant U.S. Attorney, San Diego, California, for the appellee.

Before: KOZINSKI and O'SCANNLAIN, Circuit Judges, and DAMRELL,* District Judge.

Opinion by Judge DAMRELL; Dissent by Judge KOZINSKI.

DAMRELL, District Judge:

We must decide various issues arising from appellants' convictions and one appellant's sentence for federal crimes arising out of a traffic stop near a border patrol checkpoint.

I

On the afternoon of October 15, 1996, border patrol agents stationed at the Northbound Highway 86 checkpoint in El Centro, California received a tip from a passing motorist that two northbound vehi-

---

* The Honorable Frank C. Damrell, Jr., United States District Judge for the Eastern District of California, sitting by designation.

cles with Mexicali, Mexico license plates had just turned around south of the checkpoint. Border Patrol Agents Brian Johnson and Carl Fisher immediately proceeded south on Highway 86 in separate, marked vehicles. About one minute later and one mile south of the checkpoint, the agents observed a blue Chevrolet Blazer and a red Nissan sedan with Mexicali plates pull off the shoulder and onto the highway and proceed southbound. Other than a semi tractor-trailer, the agents had not observed any vehicles traveling southbound on the highway for at least ten minutes prior to receiving the tip. The area where the agents observed the vehicles pulling onto the highway is near large signs indicating that the checkpoint is open. According to the agents, the area is routinely used by people to turn around in order to avoid inspection and is a known spot for dropping off and picking up aliens and drugs. Agent Johnson could not recall stopping a vehicle following a similar turn around "where we didn't have a violation of some sort," and, of the numerous vehicles stopped by Agent Fisher following similar turn arounds, all but one involved "illegal aliens inside the vehicle or narcotics violations."

After observing the vehicles pulling onto the highway, Agent Johnson pulled behind the Blazer and observed that both the driver and the passenger appeared to be Hispanic. After the driver and the passenger saw Agent Johnson pull up behind their vehicle, the passenger picked up a newspaper and began reading, an act which Agent Johnson found odd under the circumstances. Agent Johnson stopped the Blazer, identified himself as a border patrol agent and inquired as to the occupants' citizenship. The Blazer was driven by appellant Lorenzo Sanchez–Guillen. Sanchez–Guillen and his passenger presented Agent Johnson with I–586 (border crossing) cards which allow Mexican citizens to travel up to 25 miles inside the United States for no longer than 72 hours. Agent Johnson stopped the Blazer approximately 50 miles from the border. Johnson arrested Sanchez–Guillen and his pas-

senger and instructed them to proceed northbound to the Highway 86 checkpoint for processing as he followed behind them.

While Agent Johnson stopped the Blazer, Agent Fisher accelerated to catch up to the Nissan. Once he caught up to the Nissan, he could clearly see that the driver was Hispanic. After following the vehicle for about four miles, Agent Fisher pulled it over. The Nissan was driven by appellant German Espinoza Montero–Camargo. When Agent Johnson returned to the checkpoint with Sanchez–Guillen and his passenger, he was informed that there was a possibility that the Nissan contained contraband. Agent Johnson instructed Sanchez–Guillen and his passenger to remain at the checkpoint while he went to assist Agent Fisher. The agents searched the trunk of the Nissan and found two large bags of marijuana.

When he returned to the checkpoint, Agent Johnson searched the Blazer and found a loaded .32 caliber pistol in the glove compartment. After being informed of the pistol, Agent Fisher searched the occupants and found an ammunition clip that fit the pistol in the passenger's purse.

Appellants were charged with conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. §§ 846 and 841(a)(1) and possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Appellant Sanchez–Guillen was also charged with being an illegal alien in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2) and aiding and abetting the carrying of a firearm during the commission of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1) and (2).

Montero–Camargo entered a conditional guilty plea to conspiracy to possess and possession of marijuana with the intent to distribute. A jury convicted Sanchez–Guillen of conspiracy to possess and possession of marijuana with the intent to distribute and being an illegal alien in possession of ammunition.

## II

■ Appellants first argue that the district court's denial of their respective motions to suppress should be reversed because the agents did not have reasonable suspicion to stop the vehicles they were driving.

■ Whether reasonable suspicion existed to justify an investigatory stop is a legal conclusion subject to de novo review. *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). A district court's denial of a motion to suppress evidence is reviewed de novo, and its factual findings are reviewed for clear error. *See United States v. Kemmish,* 120 F.3d 937, 939 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1087, 140 L.Ed.2d 144 (1998).

■ The Fourth Amendment prohibits an officer from stopping a vehicle without a reasonable or founded suspicion of criminal conduct at the time of the stop. *United States v. Rodriguez,* 976 F.2d 592, 594 (9th Cir.1992). Reasonable suspicion exists when an officer is aware of specific, articulable facts, which, together with objective and reasonable inferences, form a basis for suspecting that the particular person to be detained has committed or is about to commit a crime. *United States v. Salinas,* 940 F.2d 392, 394 (9th Cir.1991). The facts are to be interpreted in light of a trained officer's experience, and the whole picture must be taken into account. *United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

The Supreme Court has set forth a nonexclusive list of factors upon which border patrol agents may rely in finding reasonable suspicion: "(1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including 'obvious attempts to evade officers'; (6) appearance or behavior of the passengers; (7) model and appearance of the vehicle; and, (8) officer experience." *United States v. Garcia–Barron,* 116 F.3d 1305, 1307 (9th Cir.1997) (citing *United States v. Brignoni–Ponce,* 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)).

■ Appellants are correct that avoidance of a checkpoint, without more, is insufficient to support a finding of reasonable suspicion. *See United States v. Ogilvie,* 527 F.2d 330, 331–332 (9th Cir. 1975). Apparent attempts to avoid checkpoints combined with other factors, however, have generally been found to constitute reasonable suspicion. *See Garcia–Barron,* 116 F.3d at 1307–08 (reasonable suspicion founded upon appellant's attempt to avoid checkpoint, use of a rental car, time of day, route taken, failure to turn off at either of the most common destinations for the limited traffic that legitimately traveled the road, and fact that the area was known for alien smuggling); *see also United States v. Rodriguez–Sanchez,* 23 F.3d 1488, 1493 (9th Cir.1994) (factors supporting reasonable suspicion included high volume of alien smugglers on highway where stop occurred and driver and passenger were Hispanic); *United States v. Medina–Gasca,* 739 F.2d 1451, 1453 (9th Cir.1984) (factors supporting reasonable suspicion included area in which vehicle was traveling was notorious route for circumventing checkpoint, vehicles traveling in close proximity to one another, and tandem u-turn when patrol vehicle approached). Here, the record contains numerous "other factors" in addition to the apparent avoidance of the checkpoint, including: the agents' observations, such as tandem driving and the ethnicity of the occupants; the behavior of Sanchez-Guillen's passenger; the agents' prior experience during stops following similar turn arounds; and the characteristics of the area, including its use as a pickup and drop-off point for aliens and drugs. Such other factors, when combined with the apparent avoidance of the checkpoint, provide a well founded basis for the stop. *See Garcia–Barron* 116 F.3d at 1307–08.

## III

■ Sanchez–Guillen next contends that the district court's denial of his motion to suppress should be reversed because the agent did not have probable cause to search the Blazer. The validity of a warrantless search is reviewed de novo. *United States v. Van Poyck*, 77 F.3d 285, 290 (9th Cir.), *cert. denied*, 519 U.S. 912, 117 S.Ct. 276, 136 L.Ed.2d 199 (1996). Underlying factual findings are reviewed for clear error. *United States v. Hernandez*, 27 F.3d 1403, 1406 (9th Cir.1994), *cert. denied*, 513 U.S. 1171, 115 S.Ct. 1147, 130 L.Ed.2d 1106 (1995).

■ Probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas*, 517 U.S. at 696. In finding there was probable cause to search the Blazer, the district court relied on its conclusion that the vehicles were traveling in tandem and the discovery of marijuana in the Nissan prior to the search of the Blazer. Tandem driving may indicate criminal activity. *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir.1991). There is ample evidence in the record to support the district court's finding that the vehicles driven by appellants were traveling in tandem, including the passing motorist's tip regarding the turn around and the agents' observations. Moreover, at the time he searched the Blazer, Agent Johnson already knew that marijuana had been found in the Nissan. Accordingly, the district court did not err in finding there was probable cause to search the Blazer.

## IV

■ Appellants next maintain that the district court erred in denying their respective motions to dismiss for violations of the Speedy Trial Act. The district court's application of the Speedy Trial Act is reviewed de novo. *United States v.*

*Nelson*, 137 F.3d 1094, 1108 (9th Cir.), *cert. denied sub nom, Sehorn v. United States*, —— U.S. ——, 119 S.Ct. 231, 142 L.Ed.2d 190 (1998), and *cert. denied sub nom, Lott v. United States*, —— U.S. ——, 119 S.Ct. 231, 142 L.Ed.2d 190, and *cert. denied*, —— U.S. ——, 119 S.Ct. 232, 142 L.Ed.2d 190. The district court's factual findings under the Speedy Trial Act are reviewed for clear error. *Id.* at 1108–09.

■ Absent an exclusion of time pursuant to 18 U.S.C. § 3161(h), a criminal trial must commence within 70 days from the filing date of the information or indictment against the appellant, or from the date the appellant has appeared in the court where the charge is pending, whichever occurs last. 18 U.S.C. § 3161(c)(1). Time began to run on November 22, 1996, the date the initial indictment was filed and appellants were arraigned. On December 9, 1996, appellants filed a number of motions, including a motion by Sanchez–Guillen to suppress evidence on the ground that the agent lacked probable cause to search. The court ruled on those motions on January 6, 1997. Time was therefore excluded from December 9, 1996 to January 6, 1997. 18 U.S.C. § 3161(h)(1)(F). In ruling on Sanchez–Guillen's motion to suppress, the district court indicated it was granting the motion this time, but stated that it would allow further briefing on the issue because Sanchez–Guillen had failed to raise the issue of the items seized in his written motion. The court set a briefing schedule. It did not receive all filings in connection with the motion until January 30, 1997. A hearing was held on March 12, 1997 at which time the court granted Sanchez–Guillen's "renewed motion to suppress." Time is excluded after a hearing has been held where the district court awaits additional filings from the parties that are needed for the proper disposition of the motion. *Henderson v. United States*, 476 U.S. 321, 331, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986). Time was therefore excluded from December 9, 1996 through March 12, 1997.[1]

---

1. In *Henderson*, the court did not rule on the

motion before it, but rather deferred its deci-

■■ The government appealed the district court's order granting Sanchez–Guillen's motion to suppress. The government's notice of interlocutory appeal was entered on April 15, 1997, *nunc pro tunc* to March 12, 1997. The government, however, moved to voluntarily dismiss its interlocutory appeal following the district court's order granting the government's motion for reconsideration and denying Sanchez–Guillen's motion to suppress. The government's motion to dismiss was granted on June 2, 1997. Time was therefore excluded from March 12, 1997 to June 2, 1997. 18 U.S.C. § 3161(h)(1)(E).

■■ On June 16, 1997, Montero–Camargo moved to dismiss the indictment for violation of the Speedy Trial Act. Sanchez–Guillen filed a similar motion on June 23, 1997. Both motions were denied on June 30, 1997. Time was therefore excluded from June 16, 1997 to June 30, 1997. 18 U.S.C. § 3161(h)(1)(F). Trial commenced the following day on July 1, 1997. Accordingly, there were 31 nonexcludable days of delay, and the Speedy Trial Act was not violated as to either appellant because this was to be a joint trial. *See* 18 U.S.C. § 3161(h)(7).

### V

■■ Sanchez–Guillen next contends that the district court erred in refusing to instruct the jury that knowledge of his illegal status was an element of the ammunition possession charge. Whether the instructions actually misstated an element of the crime is subject to de novo review. *United States v. McKittrick*, 142 F.3d 1170, 1176 (9th Cir.1998), *cert. denied,* — U.S. ——, 119 S.Ct. 806, 142 L.Ed.2d 667 (1999).

Pursuant to 18 U.S.C. § 922(g)(5), it is unlawful for an illegal alien to "possess in or affecting commerce, any firearm or ammunition." Pursuant to 18 U.S.C.

§ 924(a)(2), "[w]hoever knowingly violates subsection ... (g) ... of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both."

This court has not yet ruled on whether a conviction for being an illegal alien in possession of a firearm or ammunition in violation of 18 U.S.C. § 922(g)(5) requires proof that the defendant knew he or she was in the United States illegally. This court has, however, ruled that knowledge of one's felon status is not an element of the crime of being a felon in possession of a firearm or ammunition under 18 U.S.C. § 922(g)(1). *See United States v. Miller,* 105 F.3d 552, 555 (9th Cir.), *cert. denied,* — U.S. ——, 118 S.Ct. 186, 139 L.Ed.2d 125 (1997) ("the § 924(a) knowledge requirement applies only to the possession element of § 922(g)(1), not to the interstate nexus or to felon status").

The language of § 922(g)(1), making it unlawful for a felon to possess a firearm or ammunition,[2] mirrors the language of § 922(g)(5), making it unlawful for an illegal alien to possess the same. Thus, the court's reasoning in *Miller* is equally applicable here. Sanchez–Guillen need not have known that he was in the United States illegally to "knowingly violate" 18 U.S.C. § 922(g)(5) as knowledge pertains only to the item possessed and not to the status of the possessor. *See Miller,* 105 F.3d at 555. Accordingly, the instructions were accurate as given.

### VI

■■ Sanchez–Guillen next maintains that the district court erred in denying his motion to suppress statements made by him on the roadside after (1) he admitted his and his passenger's alienage, and (2) Agent Johnson inspected his border crossing card and knew he was "out of

sion pending receipt of posthearing submissions from the parties. Here, insofar as the district court acknowledged that the issue had not been addressed in Sanchez–Guillen's written brief and allowed for supplemental briefing, time was properly excluded until March 12, 1997.

**2.** Section 922(g)(1) makes it unlawful for a felon to "possess in or affecting commerce, any firearm or ammunition."

status." The district court's denial of a motion to suppress statements is reviewed de novo. *United States v. Moreno–Flores,* 33 F.3d 1164, 1168 (9th Cir.1994). Whether a defendant was constitutionally entitled to a *Miranda* warning is an issue of law reviewed de novo. *United States v. Nieblas,* 115 F.3d 703, 705 (9th Cir.1997).

A *Miranda* warning is required for custodial interrogations. *Id.* "A defendant is in custody when, based upon a review of all the pertinent facts, 'a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave.'" *United States v. Wauneka,* 770 F.2d 1434, 1438 (9th Cir.1985) (quoting *United States v. Booth,* 669 F.2d 1231, 1235 (9th Cir. 1981)). In *Berkemer v. McCarty,* 468 U.S. 420, 435–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court held that the roadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute "custodial interrogation" for purposes of *Miranda.* Accordingly, the motorist's pre-arrest statements made in response to such questioning were admissible against him. *Id.* at 442. The Court acknowledged that "a traffic stop significantly curtails the 'freedom of action' of the driver and passengers, if any, of the detained vehicle .... few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." *Id.* at 436. Nevertheless, the court held that traffic stops do not exert pressures upon a detained person that sufficiently impair the free exercise of the privilege against self-incrimination so as to require that person be advised of his or her constitutional rights. *Id.* at 440. The Court distinguished a traffic stop from a "stationhouse" interrogation on two grounds: (1) a traffic stop is presumptively temporary and brief; and (2) the atmosphere is substantially less "police dominated," because the traffic stop is public and the detained motorist typically is confronted by only one or at most two policemen. *Id.* at 437–39.

Sanchez–Guillen argues that *Berkemer* is "not necessarily controlling" here because it involved a traffic stop, not an "immigration detention." Certainly there are differences between the stop at issue here and a routine traffic stop. Notably, the consequences of being found to be out-of-status are more severe than being found in violation of the traffic laws. An alien found to be out-of-status will likely be taken into custody, whereas a motorist found to be in violation of the traffic laws will likely receive a citation. Like a traffic stop, however, a person stopped for suspicion of being out of status would reasonably anticipate the stop would be temporary and brief so long as he or she was not in violation of the law. Additionally, as in most traffic stops, Sanchez–Guillen was confronted by only one agent.

Before *Berkemer,* the Court addressed the issue of border stops in *Brignoni–Ponce* and explained that:

> [B]ecause of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. As in *Terry,* the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause.

*Brignoni–Ponce,* 422 U.S. at 881–882 (citation omitted). As set forth above, the events leading up to the stop of appellants' vehicles gave rise to reasonable suspicion that appellants were in the country illegally and/or were involved in alien and/or drug smuggling. Agent Johnson's ques-

tions were limited to Sanchez–Guillen's citizenship, immigration status, and the suspicious circumstance of the turn around. Agent Johnson's testimony at trial concerning Sanchez–Guillen's statements on the roadside are summarized as follows: When Agent Johnson stopped the Blazer driven by Sanchez–Guillen, he went to the driver's side, identified himself as a border patrol agent, and asked what Sanchez–Guillen's citizenship was. Sanchez–Guillen replied, "we are Mexican citizens." Sanchez–Guillen presented Agent Johnson with a border crossing card which allowed Sanchez–Guillen to travel either 25 miles beyond the border or stay 72 hours in the United States within a 25–mile boundary. Sanchez–Guillen was beyond 25 miles of the border, and thus, was in the United States illegally. Agent Johnson then asked him why he turned around, and he responded that he did not have the proper documents to pass through the checkpoint.[3]

Sanchez–Guillen contends that once he admitted his citizenship and Agent Johnson inspected his border crossing card and learned that he was out-of-status, Agent Johnson was required to give him a *Miranda* warning before asking him any additional questions. According to the testimony, Agent Johnson asked Sanchez–Guillen one question after reviewing his border crossing card: why he turned around.[4] That solitary question was clearly investigatory in nature and related to the reason for the stop. That Agent Johnson may have had probable cause to arrest Sanchez–Guillen for being out of status at the time he inquired about the turn around does not give rise to the constitutional imperative. As this court explained in *Woods:*

> Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.

*United States v. Woods,* 720 F.2d 1022, 1030–31 (9th Cir.1983) (citing *Hoffa v. United States,* 385 U.S. 293, 310, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966)). Indeed, " '[i]t was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which

---

**3.** The only evidence introduced at trial concerning Sanchez–Guillen's statements on the roadside was the testimony of Agent Johnson. At trial, he testified as follows:

Q: What did you do when you stopped the Blazer?
A: When I stopped the Blazer, I went to the driver's side, identified myself as a border patrol agent, and asked what his citizenship was.
Q: What was the response?
A: He said, we are Mexican citizens.
. . .
Q: Did he present any documents to you?
A: Yes, he did. He presented a border crossing card.
Q: What exactly is a border crossing card?
A: A border crossing card is a card issued to individuals that live in border towns along the Mexican border, Mexican/U.S. border, that allows them to travel either 25 miles beyond the border or stay 72 hours in the United States within a 25–mile boundary.
Q: Were these individuals within the 25 miles allowed by the border crossing cards?

A: No, they were not.
. . .
Q: And if an individual is beyond the 25–mile limit, what is their status?
A: Their status—if all they have is a border crossing card, they are in the United States illegally.
Q: Did you ask the defendant if he had any other papers?
A: Yes, I did.
Q: What was his response?
A: He stated he did not have.
Q: Did you ask the defendant why he turned around?
A: Yes, I did.
Q: What was his response?
A: He stated he turned around because he did not have the proper documents to pass through the checkpoint.
Jury Trial Tr., 138:25–139:13.

**4.** The only testimony given at trial regarding this matter was the testimony of Agent Johnson.

led the court to impose the Miranda requirements with regard to custodial questioning.'" *Beckwith v. United States*, 425 U.S. 341, 346–47, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (quoting *United States v. Caiello*, 420 F.2d 471, 473 (2d Cir.1969), *cert. denied*, 397 U.S. 1039, 90 S.Ct. 1358, 25 L.Ed.2d 650 (1970)). Agent Johnson's brief detention of Sanchez–Guillen and single additional question did not reach the level of a custodial interrogation.

 Finally, even if the district court erred by admitting Sanchez–Guillen's statement concerning the reason for the turn around, the admission constituted harmless error. The government had sufficient independent evidence to prove the elements of its case and, more specifically, the substance of Sanchez–Guillen's un-Mirandized statements. First, no statements concerning Sanchez–Guillen's or his passenger's alienage were elicited after he admitted his and his passenger's alienage and Agent Johnson learned he was "out-of-status". *See infra* note 3. Second, Sanchez–Guillen's statement that he turned around because he did not have proper documents to pass through the checkpoint was not critical to the government's case. Sanchez–Guillen's statement that he and his passenger were citizens of Mexico and the contents of the border crossing cards were properly admitted and were sufficient to establish Sanchez–Guillen was in the United States illegally. Therefore, even if the court's decision were erroneous, the error was harmless and not grounds to reverse Sanchez–Guillen's conviction.

*United States v. Gonzalez–Sandoval*, 894 F.2d 1043, 1047 (9th Cir.1990).[5]

## VII

 Sanchez–Guillen next contends that the district court's admission of certain evidence violated the hearsay rule. Whether the district court correctly construed the hearsay rule is a question of law reviewed de novo. *United States v. Collicott*, 92 F.3d 973, 978 (9th Cir.1996). The district court's decisions to admit evidence under exceptions to the hearsay rule are reviewed for abuse of discretion. *United States v. Ramos–Oseguera*, 120 F.3d 1028, 1034 (9th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1094, 140 L.Ed.2d 149 (1998).

### A

 Sanchez–Guillen argues that the district court erred in allowing agents to testify concerning the substance of the passing motorist's tip because such testimony constituted inadmissible hearsay. The government concedes that the testimony was hearsay, but contends that it was admissible under the present sense impression exception to the hearsay rule, Fed.R.Evid. 803(1). A present sense impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Fed.R.Evid. 803(1). To qualify under the present sense impression exception to the hearsay rule, an out-of-court statement must be nearly contemporaneous

5. The district court ruled that Sanchez–Guillen's statements concerning his alienage and the u-turn were admissible as responses to "routine investigative questions that are appropriate at the scene." Questions regarding routine investigative matters constitute "custodial interrogation" where the questioning is done while the suspect is in custody and the elicitation of information is reasonably likely to inculpate the respondent. *Id.* at 1046. Questions regarding Sanchez–Guillen's alienage and the reason for his u-turn constituted interrogation because they were related directly to an element of a crime that Agent

Johnson had reason to suspect—being in the United States illegally. *Id.* at 1047. While the district court did not address whether Sanchez–Guillen was in custody, we can affirm the court's denial of Sanchez–Guillen's motion to suppress on any basis supported by the record. *United States v. Gonzalez–Rincon*, 36 F.3d 859, 866 (9th Cir.1994), *cert. denied*, 514 U.S. 1008, 115 S.Ct. 1323, 131 L.Ed.2d 203 (1995). As set forth above, the record shows that Sanchez–Guillen was not in custody at the time of the subject questioning, and thus, *Miranda* warnings were not required.

with the incident described and made with little chance for reflection. *Bemis v. Edwards,* 45 F.3d 1369, 1372 (9th Cir.1995). The declarant must also have personal knowledge of what he or she describes. *Id.* at 1373.

The motorist's tip clearly constituted a statement describing an event based upon personal knowledge. Moreover, there was evidence that the motorist's statement was made only "about a minute" after he observed the event in question, leaving little chance for reflection. Finally, the trustworthiness of the statement is bolstered by the declarant's status as a mere bystander with no apparent motivation for providing false information. Thus, the substance of the motorist's tip was properly admitted as a present sense impression.

#### B

██ Sanchez–Guillen also contends that the vehicle registration for the license plates affixed to the Nissan driven by Montero–Camargo should have been excluded from evidence as inadmissible hearsay.[6] The government concedes that the registration is hearsay, but argues that it falls within the "business records" and "public records" exceptions to the hearsay rule, Fed.R.Evid. 803(6) and (8)(A).

Federal Rule of Evidence 803(6) makes admissible records of regularly conducted activity "made at or near the time by, or from information transmitted by, a person with knowledge, ... as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." The vehicle registration was a printout from the Mexicali Department of Motor Vehicle's (DMV) database and was obtained from the "head supervisor" there who certified the document by affixing the state seal of Baja California and initialing it. The United States Consulate in Tijuana verified that the individual who certified the registration was an official with the Mexicali DMV. The Mexicali DMV's maintenance of a vehicle registration database is strong evidence that its regular practice is to record and compile vehicle registration information. This court previously held that an application for Alberta, Canada license plates was properly admitted as a business record of the Alberta Division of Motor Vehicles. The vehicle registration here was likewise properly admitted under the business records exception to the hearsay rule. *United States v. Childs,* 5 F.3d 1328, 1332–33 (9th Cir.1993), *cert. denied,* 511 U.S. 1011, 114 S.Ct. 1385, 128 L.Ed.2d 60 (1994).

██ Federal Rule of Evidence 803(8)(A) makes admissible "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... the activities of the office or agency." The justification for the public records exception "is the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." *United States v. DeWater,* 846 F.2d 528, 530 (9th Cir.1988). The registration of automobiles is a bureaucratic, nonadversarial activity undertaken by government employees with no stake in the outcome of criminal prosecutions such as this. Accordingly, the vehicle registration was also properly admitted under the public records exception.

#### VIII

██ Finally, Montero–Camargo contends that the district court erred in denying his request for a downward departure based on aberrant behavior. Because the district court exercised its discretion in refusing to depart downward, this court lacks jurisdiction to review that decision.

---

**6.** According to the registration, the license plates were issued to a 1976 Ford LTD registered to Sanchez–Guillen.

*See United States v. Webster,* 108 F.3d 1156, 1159 (9th Cir.1997).

**AFFIRMED.**

KOZINSKI, Circuit Judge, dissenting:

Because I am unable to find any meaningful distinction between this case and *United States v. Ogilvie,* 527 F.2d 330 (9th Cir.1975), I respectfully dissent.

The facts of *Ogilvie* are simple. Ogilvie was driving north on Interstate 19 in Arizona. *See Ogilvie,* 527 F.2d at 331. Border Patrol agents had set up a checkpoint beneath an overpass that was 14 miles north of the Mexican border. When Ogilvie got within sight of the checkpoint, she exited the highway, crossed the overpass, and headed back the way she came on the interstate. *See id.; see also id.* at 332 (Moore, J., dissenting). The Border Patrol agents thought her sudden change in direction was suspicious, and so chased her down and stopped her. *See id.* at 331. Following the stop, they searched her car and found marijuana. The district court granted her motion to suppress and the government argued that "Ogilvie's simple avoidance of the checkpoint, without more, gave the officers the requisite 'founded suspicion'" to stop her. *Id.* at 331–32. We rejected that argument, in words that read directly on our case: "There is no evidence that Ogilvie drove fast, as if running away, disobeyed any traffic laws, or otherwise drove in an unusual or erratic manner. Ogilvie did what she had a legal right to do.... We hold that the proximity of the turn to the checkpoint, regardless of the legality of the checkpoint, was not a sufficient foundation on which to rest a reasonable suspicion." *Id.* at 332. In our case, the Border Patrol agents rested their decision to stop Montero–Camargo and Sanchez–Guillen on this very same insufficient foundation.

The majority tries to distinguish *Ogilvie* by citing three cases for the proposition that reasonable suspicion is present when there are "[a]pparent attempts to avoid checkpoints combined with other factors." Maj. op. at 1119. Those cases are all clearly different. In *United States v. Garcia–Barron,* 116 F.3d 1305 (9th Cir.1997), the defendants had exited the highway and were in the process of traveling along side roads leading back to the highway past the checkpoint. *See id.* at 1306. Such avoidance behavior is far different from turning around before reaching a checkpoint, which can be done for any number of legitimate reasons.

*United States v. Rodriguez–Sanchez,* 23 F.3d 1488 (9th Cir.1994), is similarly inapposite. There, the defendants made no attempt to avoid a Border Patrol checkpoint. Rather, their car "passed through the checkpoint" and then "accelerated more aggressively than other cars and made several rapid lane changes as it accelerated, passed cars and exited the area rapidly." *Id.* at 1490. The attempt to run a checkpoint and the erratic driving gave the officers ample basis for suspecting the car's occupants. But I don't see what possible relevance it has to our case where, for all the record shows, the defendants were driving normally.

*United States v. Medina–Gasca,* 739 F.2d 1451 (9th Cir.1984), is similar to *Garcia–Barron* in that the defendants were stopped while traveling along "a notorious route for circumventing the Interstate 5 checkpoint." *Id.* at 1453 (internal quotation marks omitted). The defendants here were stopped under much more innocuous circumstances: Far from trying to avoid the checkpoint, they turned around before they got there and headed back from whence they came. *Ogilvie* squarely holds that this cannot give rise to reasonable suspicion. Indeed, *Ogilvie* presented a more compelling case because the checkpoint was only 14 miles north of the border, while the checkpoint here was approximately 50 miles. Obviously, the reasons for making a U-turn unrelated to an immigration checkpoint are more numerous the farther one gets from the border.

None of the "numerous 'other factors'" cited by the majority justify the stop in our case. The purported observations of

tandem driving consisted of about a minute's worth of seeing the two cars driving near each other. This is an insignificant amount of observation and we have held it to be so in the past. *See United States v. Robert L.,* 874 F.2d 701, 704 (9th Cir.1989) (noting that observing cars traveling together for "approximately one kilometer" is "only ... the briefest of observations" and thus not a significant factor in establishing reasonable suspicion). The ethnicity of the vehicles' occupants cannot be determinative, because of the rule that "prohibits reasonable suspicion from being based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *Rodriguez–Sanchez,* 23 F.3d at 1492. Finally, we should not accept a blanket invocation of the "characteristics of the area" as dispositive in the reasonable suspicion calculus, for to do so is to hold that a weakened version of the Fourth Amendment applies in some areas.

The fact that the officers who stopped Montero–Camargo and Sanchez–Guillen had made multiple stops after similar turnarounds, *see* Maj. op. at 1117, shows only that they are ignoring the teachings of *Ogilvie.* The Border Patrol's repeated disregard of our law certainly cannot justify this unconstitutional stop. But we can hardly expect law enforcement officers to follow the law if we look the other way when they obtain convictions based on such illegal stops.