# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

   v.

SERGIO MANZO-JURADO,
    *Defendant-Appellant.*

No. 05-30186

D.C. No.
CR-04-00169-SEH

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted
April 5, 2006—Seattle, Washington

Filed June 20, 2006
Amended July 31, 2006

Before: William C. Canby, Jr., Ronald M. Gould, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea;
Dissent by Judge Gould

**COUNSEL**

Anthony R. Gallagher, Assistant Federal Defender, Federal Defenders of Montana, Great Falls, Montana, for the defendant-appellant.

William W. Mercer, United States Attorney, and Elizabeth Horsman, Assistant United States Attorney, United States Attorney's Office, Helena, Montana, for the plaintiff-appellee.

**ORDER**

The disposition filed on June 20, 2006 and available at 2006 WL 1679413 is AMENDED as follows. At page 2, note 3 of the opinion, the following sentence shall be deleted in its entirety:

> At oral argument, the Government conceded that Manzo-Jurado was seized within the meaning of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, so as to require reasonable suspicion.

At page 2, note 3 of the disposition, the following sentences shall be inserted to replace the deleted sentence:

> Manzo-Jurado was seized within the meaning of *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968), because Kaul's "show hands order [to the truck occupants] was a 'meaningful interference' with [Manzo-Jurado's] freedom." *See*

*United States v. Enslin*, 327 F.3d 788, 795 (9th Cir. 2003) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 n.5, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984)). On cross-examination, Kaul agreed that he had ordered the truck occupants to show their hands when he had "first approached" the truck. Therefore, the order to show hands took place before Manzo-Jurado admitted to being in this country illegally. We find "[a] reasonable person in [Manzo-Jurado's] situation would not have felt free to ignore the request of [Kaul]." *See id.*

With this amendment, a majority of the panel votes to deny the petition for rehearing. Judge Gould votes to grant the petition for rehearing.

Appellant United States' petition for rehearing is DENIED.

IT IS SO ORDERED.

---

## OPINION

BEA, Circuit Judge:

We revisit the important issue of when information available to officers creates a reasonable suspicion that an individual is in the United States illegally so as to justify an investigatory stop. Given the particular facts of this case—individuals' appearance as a Hispanic work crew, inability to speak English, proximity to the border, and unsuspicious behavior—law enforcement lacked reasonable suspicion that Appellant and his co-workers were in this country illegally.

### I.

On November 20, 2004, Manzo-Jurado and five of his co-workers attended the high school football state championship

game between Havre High School and Billings Central High School in Havre, Montana. Manzo-Jurado and his co-workers stood together by a fence and conversed in Spanish.

During the second half of the game, a Havre police officer, Officer Robinson, noticed Manzo-Jurado and his co-workers. Thinking they might be illegal aliens, Robinson called the United States Border Patrol. Border Patrol Agent David Bischoff responded to the call and drove his patrol unit into the stadium. The Border Patrol dispatcher informed Bischoff that the group was not creating any problems and did not appear to be doing anything illegal.

Robinson also spoke with Border Patrol Agent Arlin Kaul who, while off duty, was watching the game with his wife. Kaul had not noticed the men until Robinson brought them to his attention. When Bischoff arrived at the stadium, Kaul and Bischoff walked behind the bleachers, glanced quickly at the Hispanic men, and decided to conduct a field interview in a more private setting than the football game. Bischoff (uniformed, and on duty) and Kaul (not in uniform, and off duty) then parted ways.

Upon leaving Bischoff, Kaul approached the group of Hispanic men to get a better look. Whereas Robinson had mentioned six men, Kaul noticed only four. Kaul observed the men speaking in Spanish to each other. They did not mingle with the other attendees, they were unaccompanied by family members, they appeared to comprise a work crew, and they did not cheer for one team or the other. While Kaul was observing the men, Bischoff returned to his Border Patrol car and positioned it on a street near the stadium.

Sometime before Kaul approached the group to get a better look, with about ten to twenty minutes left in the game, Manzo Jurado and another member of his group, Pedro Santos, had left the game to get out of the cold. As they left the stadium, they walked past their vehicle—a truck owned by

Polaris, their employer—and passed Bischoff's marked Border Patrol car. About one block later, they turned around and headed back, again passing the Border Patrol car. Manzo-Jurado and Santos noticed Bischoff's Border Patrol car both times they passed it. They found where they had parked, got in the truck, started it, turned it around, and remained on the same street with the engine running.

Fifteen or twenty minutes later, Manzo-Jurado and Santos were joined by their four remaining co-workers. At that point, Kaul approached the driver's-side door of the truck while FBI Agent Stacy Smiedala[1] walked to the back of the truck, drew her gun from her ankle holster, and approached the passenger-side door.[2] Kaul first addressed the passengers in English but, when he received no verbal response, he identified himself in Spanish as a Border Patrol agent, using the slang term "la migra." At some point, Kaul reached into the truck and turned off the engine. Kaul also told the men, in Spanish, to keep their hands where the agents could see them. Kaul asked the men where they were from and whether they had immigration documents. Whereas five members of the group stated that they were from El Salvador and had immigration documents, Manzo-Jurado stated that he was from Mexico and did not have such documents.

The agents immediately placed Manzo-Jurado under arrest. Several other Border Patrol vehicles arrived on the scene and, after Bischoff learned from Kaul that Manzo-Jurado was illegal, Bischoff took over the investigation. Manzo-Jurado was taken to the station for processing.

---

[1]During the game, Kaul had approached Smieldala, who was also off duty, and had requested back-up for the investigatory stop because Kaul was unarmed. Smieldala observed the group of Hispanic men only after Kaul pointed them out to her and her observations of the group did not add anything to Kaul's testimony.

[2]One of Manzo-Jurado's co-workers testified to having seen Smiedala's drawn gun, but Manzo-Jurado testified he had not seen the gun.

About a week after Manzo-Jurado's arrest, Border Patrol agents contacted Polaris and received copies of documents that Manzo-Jurado had used to gain employment. Further investigation revealed that Manzo-Jurado's social security card was counterfeit, and a criminal complaint was filed against him, charging him with misuse of a social security number in violation of 42 U.S.C. § 408(a)(7)(B). Manzo-Jurado was arraigned in district court on December 21, 2004.

On January 12, 2005, Manzo-Jurado filed a motion to suppress all evidence derived from his arrest. He argued that the agents had lacked reasonable suspicion to justify the investigatory stop that had revealed his illegal status. The district court held a hearing on February 9, 2005, and denied Manzo-Jurado's motion. The district court held that Manzo-Jurado had not been subjected to full-blown arrest until after admitting his illegal status, and that reasonable suspicion had justified the investigatory stop. In addition, the district court found that, even if the agents had lacked reasonable suspicion to stop Manzo-Jurado, Manzo-Jurado's motion would fail because identity evidence is not suppressible.

The parties agreed to a trial by stipulated facts, which took place on February 22, 2005. The district court found Manzo-Jurado guilty and sentenced him to time served, followed by two years of supervised release. This timely appeal followed.

## II.

The reasonable suspicion inquiry is a question of mixed law and fact, and we review it *de novo*. *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2001).

## III.

[1] The Fourth Amendment requires that, before officers conduct an investigatory stop of an individual, they must have reasonable suspicion the individual has, or is about to have,

committed a crime.[3] *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court in *Brignoni-Ponce* held that, "when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." 422 U.S. at 881. In *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002), the Supreme Court's most recent opinion regarding the reasonable suspicion standard for investigatory stops, the Court explained:

> [W]e have said repeatedly that [reviewing courts] must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." Although an officer's reliance on a mere "hunch" is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.

---

[3]Manzo-Jurado was seized within the meaning of *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968), because Kaul's "show hands order [to the truck occupants] was a 'meaningful interference' with [Manzo-Jurado's] freedom." *See United States v. Enslin*, 327 F.3d 788, 795 (9th Cir. 2003) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 n.5, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984)). On cross-examination, Kaul agreed that he had ordered the truck occupants to show their hands when he had "first approached" the truck. Therefore, the order to show hands took place before Manzo-Jurado admitted to being in this country illegally. We find "[a] reasonable person in [Manzo-Jurado's] situation would not have felt free to ignore the request of [Kaul]." *See id.*

*Id.* (internal citations omitted).

**[2]** At the same time, we will defer to officers' inferences only when such inferences rationally explain how the objective circumstances "arouse[d] a reasonable suspicion that *the particular person being stopped* ha[d] committed or [was] about to commit a crime." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). "[W]hile an officer may evaluate the facts supporting reasonable suspicion in light of his experience, experience may not be used to give the officers unbridled discretion in making a stop." *See id.* at 1131 (quoting *Nicacio v. INS,* 797 F.2d 700, 705 (9th Cir. 1986)). Accordingly, to establish reasonable suspicion, an officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the law-abiding population. *See, e.g.*, *Sigmond-Ballesteros*, 285 F.3d at 1121; *Montero-Camargo*, 208 F.3d at 1129-33; *United States v. Rodriguez,* 976 F.2d 592, 595-96 (9th Cir. 1992). Seemingly innocuous behavior does not justify an investigatory stop unless it is combined with other circumstances that tend cumulatively to indicate criminal activity.[4] *Montero-Camargo*, 208 F.3d at 1130.

---

[4]In rejecting the Government's argument that an investigatory stop was supported by reasonable suspicion, we explained in *Rodriguez*:

> The agents tender to us the picture of innocent driving behavior but ask us to accept it as signifying criminal behavior to a trained and experienced eye. This we cannot do. Innocents, as well as criminals, sometimes keep their hands on the wheel and feet in the vehicle. Innocents, as well as criminals, drive vehicles which are as they are because many people will buy them including a space behind the seat in which a person or luggage might fit. The agents asserted that they had seen a photo of a similar vehicle which had been used in a smuggling operation at some unknown place and time. We may confidently assert that all types of vehicles have been used in smuggling operations at some place.

976 F.2d at 596.

**[3]** The Supreme Court in *Brignoni-Ponce* outlined a list of factors that "may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area." 422 U.S. at 884-85.[5] An individual's apparent Hispanic ethnicity, although a relevant factor in the reasonable suspicion inquiry, cannot by itself justify an investigatory stop in a border area.[6] *Id.* at 886-87. Beyond the group members' apparent Hispanic ethnicity, the Government here argues that several other factors aroused the agents' reasonable suspicion that one or more of the group members were in this country illegally: the group's proximity to the Canadian border, the group members' conversing with each other in Spanish, the group's conduct at the game, the group's appearance as a work crew, and Manzo-Jurado's evasive behavior. We address each factor in turn, and then collectively.

---

[5]The Supreme Court in *Brignoni-Ponce* explained:

> Officers may consider the characteristics of the area in which they encounter a vehicle. Its proximity to the border, the usual patterns of traffic on the particular road, and previous experience with alien traffic are all relevant. They also may consider information about recent illegal border crossings in the area. The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion. Aspects of the vehicle itself may justify suspicion. . . . The Government also points out that trained officers can recognize the characteristic appearance of persons who live in Mexico, relying on such factors as the mode of dress and haircut. In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling.

*Brignoni-Ponce*, 422 U.S. at 884-85.

[6]In *Montero-Camargo*, we held that, in regions heavily populated by Hispanics, an individual's apparent Hispanic ethnicity is not a relevant factor in the reasonable suspicion calculus. 208 F.3d at 1132. Such holding is inapplicable here because Havre, Montana is sparsely populated with Hispanics. *See* United States Census Bureau, Profile of General Demographic Characteristics: 2000, Havre city, Montana, *available at* http://censtats.census.gov/data/MT/1603035050.pdf (indicating that Hispanics comprise 1.5 percent of the Havre population).

## A.

**[4]** The group's location near the Canadian border was relevant to establishing reasonable suspicion. "[P]roximity to the border may be considered as a factor in the reasonable suspicion calculus." *United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th Cir. 2002). Although we typically address such factor in relation to the Mexican border,[7] we have also held that proximity to the Canadian border supports reasonable suspicion. *See United States v. Tiong*, 224 F.3d 1136, 1139 (9th Cir. 2000). It is reasonable to presume that illegal immigrants can reach U.S. locations near points of entry more easily than they can reach locations within this country's interior. *See id.* That Border Patrol stopped Manzo-Jurado and the other group members in Havre, Montana, about forty-seven miles south of the Canadian border, is a relevant factor in the reasonable suspicion calculus.

**[5]** Nonetheless, the significance of the group's location is not overriding here because the record does not establish that Havre, in general, or the football stadium, in particular, are locations notorious for containing illegal immigrants. Officers' suspicion or awareness that a particular location or route is used predominantly for illegal purposes—including illegal immigration—is strong support for a finding of reasonable suspicion. *See Arvizu*, 534 U.S. at 269, 277 (finding it significant that officers found the defendant on an unpaved road "very rarely traveled except for use by local ranchers and forest service personnel," but commonly used by smugglers to avoid a nearby border checkpoint); *United States v. Urias*, 648 F.2d 621, 622-23 (9th Cir. 1981) (finding that officers

---

[7]Whereas Border Patrol intercepted 1,139,282 illegal immigrants in southwest sectors located near the Mexican border, it intercepted only 9,959 illegal immigrants in sectors located near the Canadian border. *See* Office of Immigration Statistics, Dep't of Homeland Security, 2004 Yearbook of Immigration Statistics 156 (2005), *available at* http://www.uscis.gov/graphics/shared/statistics/yearbook/Yearbook2004.pdf.

had reasonable suspicion to stop a pickup-camper after the defendant turned onto a dirt road leading to a state fish hatchery when "in [the officer's] experience about 75% of the vehicles [unfamiliar to the officers] that turned there . . . were carrying illegal aliens attempting to avoid [a nearby] checkpoint"). By contrast, a location or route frequented by illegal immigrants, but also by many legal residents, is not significantly probative to an assessment of reasonable suspicion. *See Sigmond-Ballesteros*, 285 F.3d at 1124 (reasoning that the defendant's location on a highway commonly used for alien smuggling was of only "minimal significance" because the court presumed the great majority of people who used the highway were lawfully present in this country). Here, the agents did not testify that either Havre or the football stadium were locations notorious for containing illegal immigrants. Kaul testified that hundreds of people attended the Montana state championship football game, but he did not testify that he, or any other Border Patrol agent, had discovered illegal immigrants at the stadium. Therefore, Havre's proximity to the Canadian border only minimally supports reasonable suspicion.

## B.

**[6]** That the group members spoke to each other exclusively in Spanish and did not understand English is also relevant to the reasonable suspicion inquiry. An individual's inability to speak English may support an officer's reasonable suspicion that the individual is in this country illegally. *United States v. Contreras-Diaz*, 575 F.2d 740, 745 (9th Cir. 1978). By itself, however, an individual's inability to understand English will not justify an investigatory stop because the same characteristic applies to a sizable portion of individuals lawfully present in this country. *See Sigmond-Ballesteros*, 285 F.3d at 1126-27. Here, the agents noticed that the group members were speaking to each other only in Spanish. In addition, the group members did not understand what Kaul was saying to them until Kaul began to speak to

them in Spanish. Such information, while not dispositive, may support a finding of reasonable suspicion when other factors suggest that the individuals stopped are present in this country illegally. *See Montero-Camargo*, 208 F.3d at 1130.

## C.

[7] The agents' observation that the group members appeared out of place at the football game has no relevance to establishing reasonable suspicion because nothing suggests such behavior indicates an individual's illegal status in this country. Observations so ambiguous that they bear little relationship to any sort of criminality have low, if any, probity toward finding reasonable suspicion. *See Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1446-48 (9th Cir. 1994) (disregarding as a matter of law an officer's observations of the defendant— that the defendant failed to look at the officer, appeared nervous because he had a dry mouth, and blinked excessively— because such observations "had such a low probative value that no reasonable officer would have relied on them to determine whether there was reasonable suspicion to make an investigative stop"). Kaul testified that the group members appeared out place at the football game because they did not mingle with other attendees, did not appear associated with either high school, did not have other family members with them, and were not familiar to him.[8] Kaul's "unsupported intuition" that a group of men keeping to themselves at a football game is indicative of the men's illegal status in this country is not a rational inference that helps establish reasonable suspicion. *See id.* at 1446 (quoting *United States v. Mallides*, 473 F.3d 859, 862 (9th Cir. 1973)).

---

[8]Although an officer's lack of familiarity with an individual may be relevant when the officer is familiar with all the local residents who use a sparsely traveled route, *see Urias*, 648 F.2d at 622, such factor is irrelevant at a well-attended football game that includes fans from a distant city.

### D.

**[8]** The group's appearance as a work crew is marginally relevant to establishing reasonable suspicion. A characteristic common to both legal and illegal immigrants does little to arouse reasonable suspicion. *See Sigmond-Ballesteros*, 285 F.3d at 1125 (reasoning that the defendant's driving a pick-up truck in an agricultural area was "not particularly probative" because, although the "[d]efendant's vehicle len[t] itself to alien smuggling," pick-ups are also "commonly used by those who are engaged in agricultural work"). Here, the district court found it "significant . . . that [Kaul] observed [the] group of men conducting themselves as a work crew." The district court also found Kaul was justified in relying upon his experience "that migrant work crews in the Havre area . . . were frequently made up of foreign nationals, and on occasion included illegal aliens."[9] However, neither Kaul nor Bischoff discussed the proportion of work crews in Havre that have illegal aliens. Although in Havre Border Patrol had encountered "numerous" work crews with illegal aliens, Kaul did not testify about how many work crews Border Patrol had encountered in Havre that did not have illegal aliens.[10] Impor-

---

[9]At the suppression hearing, Kaul testified, "[Border Patrol has] encountered numerous work crews in Havre that employ illegal aliens. In some cases, all illegal aliens. In other cases, one or two illegal aliens in the group of workers." Also at the suppression hearing, Bischoff testified, "Very often in the workers that we have encountered [in Havre], there's very often aliens in the group, whether illegal or not . . . until you've talked [to them], you don't know . . . ."

[10]The dissent concludes that reasonable suspicion existed here because of the deference we owe to the "skilled judgment of immigration officials." We agree that officials' skilled judgment plays a significant role in determining whether there was reasonable suspicion. Nonetheless, in this situation, Kaul's and Bischoff's testimony regarding their prior encounters with works crews in Havre which had contained illegal immigrants does not explain how their experience and expertise led to a reasonable inference of criminality that "might well elude an untrained person." *See Arvizu*, 534 U.S. at 273. Kaul testified that Havre Border Patrol had encountered "numerous" work crews which contained illegal immigrants. However, such testimony would apply equally to situations where Havre Border Patrol had encountered five out of six work crews which contained

tantly, neither Kaul nor Bischoff testified that they knew the group's employer, Polaris, had employed illegal employees in Havre. Without such particularized information, the group's appearance as a work crew is a "broad profile[ ]" insufficient by itself to satisfy the reasonable suspicion standard. *See United States v. Rodriguez-Sanchez*, 23 F.3d 1488, 1492 (9th Cir. 1994), *overruled in part on other grounds by Montero-Camargo,* 208 F.3d at 1131-32.

### E.

Manzo-Jurado's behavior at and nearby the stadium weighs against a finding of reasonable suspicion. The totality of circumstances test takes into account both factors weighing for and against reasonable suspicion. *See Gonzalez-Rivera*, 22 F.3d at 1447. The Government claims that Manzo-Jurado attempted to evade Border Patrol by leaving the game early, by changing course when he saw Bischoff outside the stadium, and by moving the employer's truck before the rest of the group arrived. However, the undisputed facts in the record paint a different picture.[11] Manzo-Jurado left the game early.

illegal immigrants or five out of one-thousand. In fact, when asked about how likely it was that a given work crew in Havre contained an illegal immigrant, Bischoff candidly responded that "you don't know until you talk to [the crew members]."

Nor do we reason that a group's appearance as a work crew can never be substantially probative of group members' illegal status within this country; rather, we find that the officers' testimony here was too conclusory to support substantially that the stop was based on reasonable inferences rather than subjective impressions. *See Montero-Camargo*, 208 F.3d at 1131 ("[A]n officer's experience may furnish the background against which the relevant facts are to be assessed, as long as the inferences he draws are objectively reasonable; but 'experience' does not in itself serve as an independent factor in the reasonable suspicion analysis.").

[11]Because Border Patrol was not aware that Manzo-Jurado had moved the truck before stopping him, such conduct is not relevant to the reasonable suspicion calculus. *See Brignoni-Ponce*, 422 U.S. at 884 (stating that, for officers to conduct an investigatory stop, they must be "*aware* of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" (emphasis added)).

The agents did not have any reason to know whether Manzo-Jurado was aware of their presence. When Manzo-Jurado passed the truck and walked right past Bischoff's Border Patrol car, Manzo-Jurado did not attempt to escape but rather turned around and walked past the Border Patrol car a second time on his way to sitting in the Polaris truck. Finally, after Manzo-Jurado saw Bischoff in the Border Patrol car, he waited fifteen to twenty minutes inside the truck for his friends. If we were to accept such conduct as suspicious, it would be "difficult to imagine what [Manzo-Jurado] could have done . . . that might *not* have appeared suspicious to a Border Patrol agent." *Montero-Camargo*, 208 F.3d at 1136.

## F.

**[9]** Taken together, the facts available to Kaul before the stop did not establish a reasonable basis for a particularized suspicion that any of the group members were illegal immigrants. Although an officer, to form a reasonable suspicion of criminality, may rely in part on factors composing a broad profile, he must also observe additional information that winnows the broad profile into an objective and particularized suspicion of the person to be stopped. *See Diaz-Juarez*, 299 F.3d at 1142-43; *Rodriguez-Sanchez*, 23 F.3d at 1493.

In *Diaz-Juarez*, we reasoned that an officer's initial suspicion of the defendant, "while itself insufficient to justify the investigatory stop . . . ripened into reasonable suspicion as [the officer] observed [the defendant's] unusual car and driving behavior." 299 F.3d at 1142-43. The officer in *Diaz-Juarez* first became suspicious when, after receiving reports that contraband was ready to cross the Mexican border, he observed the defendant driving at an unusually late time on a route "known for illegal alien crossings and smuggling activity." *Id.* at 1140. Although these objective facts were relevant, they could not arouse a reasonable suspicion absent additional information characteristic of illegal activity. *See id.* at 1142. The officer then observed the defendant speeding up and

slowing down, consistent with a person unfamiliar with the area, and noted the defendant's car had modified suspension and bounced erratically over small bumps, "common characteristics of vehicles used for smuggling." *Id.*

Similarly, in *Rodriguez-Sanchez*, we found that an officer might not have had reasonable suspicion had he relied solely on a list of factors forming a broad profile, but that combined with more particularized facts such factors justified the investigatory stop. 23 F.3d at 1493. The defendant's Hispanic appearance, location on a route notorious for alien smuggling, lack of eye contact, and use of a car favored by alien smugglers were not enough by themselves to establish reasonable suspicion. *See id.* That the defendant drove during a Border Patrol shift change, locked his arms in an unusual position on the steering wheel, rapidly exited the border checkpoint, and changed lanes quickly without signaling formed a "weak inference that the driver was engaged in illegal activity," and "if this were all the evidence we would have [had] a very difficult decision." *Id.* However, when the officer's car approached the defendant, the defendant evasively cut across two lanes of traffic to exit the freeway. *Id.* Such driving behavior distinguished the defendant from the normal lawful individual and, together with all the other factors, sufficed to arouse a reasonable suspicion. *Id.*

[10] Unlike the officers in *Diaz* and *Rodriguez-Sanchez*, who observed particularized conduct that corroborated their initial suspicions, the agents here lacked information beyond factors forming a broad profile that would cover many lawful, newly-arrived immigrants. Kaul observed a group of Hispanic-looking men, who appeared to be in a work crew, calmly conversing in Spanish to each other. When deciding whether to conduct an investigatory stop, Border Patrol could rely in part on the group's proximity to the border, apparent ethnicity, inability to speak English, and appearance as being a work crew. However, Border Patrol was aware of no additional information distinguishing any group member from an

ordinary, lawful immigrant. After Manzo-Jurado noticed the Border Patrol car, he simply got into the truck and waited for his friends.[12] Accordingly, we hold that, under the particular circumstances of this case, Border Patrol lacked reasonable suspicion to stop Manzo-Jurado and his co-workers.

## IV.

[11] The Government claims that, even if Border Patrol did not have reasonable suspicion to justify its stop, the insuppressible nature of identity evidence and the inevitable discovery doctrine permitted the admission of evidence regarding Manzo-Jurado's fake social security card. "[A] criminal defendant cannot suppress his identity, even when there has been some prior illegality on the part of the government." *United States v. Ortiz-Hernandez*, 427 F.3d 567, 577 (9th Cir. 2005), *en banc rehearing denied*, 441 F.3d 1061 (9th Cir. 2006). The inevitable discovery doctrine allows the admission of evidence that otherwise would be suppressed as the fruit of an illegal search if such evidence would have been inevitably discovered even if the illegal search had not taken place. *See Nix v. Williams*, 467 U.S. 431, 440-44 (1984). Here, Manzo-Jurado is not attempting to suppress his identity; he is attempting to suppress evidence that he used a fake social security card to gain employment. Also, the record does not establish that, had Kaul not stopped and questioned Manzo-Jurado, the Border Patrol would have telephoned Polaris anyway and discovered Manzo-Jurado's use of the fake card. *See id.* at 444 (stating that the inevitable discovery doctrine permits the admission of illegally obtained evidence when "the prosecution can establish by a preponderance of

---

[12]Of course, such unsuspicious conduct does not rule out the possibility that an illegal immigrant is attempting to pretend he has nothing to hide. However, the Government provides no evidence establishing that, in the particular context of this case, Manzo-Jurado attempted to placate the Border Patrol's suspicion in such a way. *See Montero-Camargo*, 208 F.3d at 1130.

the evidence that the information ultimately or inevitably would have been discovered by lawful means"). Thus, we have no difficulty rejecting the Government's claim.

**V.**

**[12]** We reverse the district court's order denying Manzo-Jurado's motion to suppress, and we remand the case for proceedings consistent with this opinion.

REVERSED AND REMANDED.

---

GOULD, Circuit Judge, dissenting:

The majority opinion concludes that the factors at issue in this case did not give a particularized and objective basis for the agents' reasonable suspicion that any member of Manzo-Jurado's group was an illegal immigrant, and thus that the temporary seizure of the vehicle and questioning of its occupants was unconstitutional. However, our assessment of whether a detaining officer has such a basis must take into consideration the officer's inferences from the information available to him or her, even when those inferences might elude a person without similar experience and training. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002); *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975). I view the Supreme Court's language in *Arvizu* to require some degree of deference to the skilled judgment of immigration officials.

In light of this, although it may be a close case, I would hold that the agents' familiarity with the Havre community; their observation of a group of Hispanic-looking men at a football game who appeared to be a work-crew and were speaking only to each other, and only in Spanish; and the agents' particularized knowledge that work crews in the area

"were frequently made up of foreign nationals, and on occasion included illegal aliens" established the requisite reasonable suspicion to warrant the seizure and questioning. The seizure and questioning doubtless would be of only minimal impact on all the subjects, except Appellant, who after the brief seizure of the vehicle by delaying it could have responded that they were lawfully in the United States. The impact on Appellant of giving a truthful answer to the agents' query about papers was a consequence of his illegal presence in the United States; his interest in maintaining a covert illegal presence is not one to which our constitutional law needs give primacy under these circumstances. The intrusion on privacy of all these individuals, including Appellant, was minimal and the law enforcement needs to control illegal immigration are significant.

I respectfully dissent.