**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee*,

v.

NOE RAYGOZA-GARCIA,
　　　　　*Defendant-Appellant.*

No. 16-50490

D.C. No.
5:14-cr-00036-
VAP-1

OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, Chief District Judge, Presiding

Argued and Submitted March 8, 2018
Pasadena, California

Filed August 31, 2018

Before: Ronald M. Gould and Mary H. Murguia, Circuit
Judges, and Jack Zouhary,* District Judge.

Opinion by Judge Murguia;
Concurrence by Judges Murguia and Zouhary

---

*The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed (1) the district court's denial of the defendant's motion to suppress narcotics that Border Patrol Agents found in the defendant's vehicle, and (2) the district court's denial of the defendant's request for the court to take judicial notice of other Border Patrol stops.

Given the totality of the circumstances, and giving due weight to the Agents' observations and the district court's factual findings, the panel held that the Agents, who had a particularized and objective basis for suspecting the defendant was engaged in criminal activity, had reasonable suspicion to stop the defendant.

The panel rejected the defendant's argument that this court, or the district court, should consider evidence of "unproductive stops" in the same area, or stops from which no federal prosecutions arose, which the defendant contends show that the Border Patrol Station agents were not properly applying the reasonable suspicion standard. The panel held that this evidence does not constitute facts that are not subject to reasonable dispute and thus, under Fed. R. Evid. 201(b), are not the proper subject for judicial notice.

Specially concurring, Judges Murguia and Zouhary wrote separately because although the panel is bound by *United States v. Valdes-Vega*, 738 F.3d 1074 (9th Cir. 2013)

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

(en banc), they have concerns about how this court reviews reasonable suspicion determinations near the border.

## COUNSEL

Gail Ivens (argued), King City, California, for Defendant-Appellant.

Bram Alden (argued), Los Angeles, California, for Plaintiff-Appellee.

## OPINION

MURGUIA, Circuit Judge:

We consider defendant Noe Raygoza-Garcia's appeal of the district court's denial of his motion to suppress narcotics that Border Patrol Agents found in his vehicle. Raygoza-Garcia contends that the initial stop of his vehicle was not supported by reasonable suspicion and violated the Fourth Amendment. We hold there was reasonable suspicion to justify the stop and affirm the district court's denial of the motion to suppress the evidence of narcotics found as a result of the stop. We also affirm the district court's denial of Raygoza-Garcia's request for the court to take judicial notice of evidence of other Border Patrol stops.

### I.

### A.  The Border Patrol Agents' Initial Observations

On March 12, 2014, Raygoza-Garcia was driving a red Dodge Neon northbound on Interstate-15 ("I-15") approaching Fallbrook, California, about 70 miles from the

United States-Mexico border. At approximately 11:30 a.m., Murrieta Border Patrol Station Agents Manuel Rivera and Juan Aguayo Robles ("the Agents") were observing northbound traffic and saw the Dodge Neon pass their marked Border Patrol vehicle. The Agents state that they saw the Neon slow down from approximately the speed of the flow of traffic in a 70-mile-per-hour zone to 50 to 55 miles per hour. The Agents observed that the Neon slowed down so quickly that other vehicles traveling behind it had to go around. In their declarations, the Agents stated that in their experience, drug smugglers will often quickly reduce their speed when they pass by law enforcement. At the evidentiary hearing, Agent Rivera stated, however, that smugglers will also sometimes increase their speed when they see law enforcement. Raygoza-Garcia testified he did not drive slower than the rate of traffic around him.

The Agents also observed Raygoza-Garcia's posture when Raygoza-Garcia passed the Agents initially. The Agents saw Raygoza-Garcia sitting upright, and he did not look at the Agents. The Agents stated that drug smugglers may have rigid posture because they are nervous.

The Agents decided to follow the Neon. Around this time, they also noticed that the vehicle had a Baja California, Mexico license plate. Agent Aguayo conducted a records check of the vehicle, which showed it had crossed the United States-Mexico border that morning. The vehicle had also crossed the border multiple times in the prior month. In four crossings in the prior weeks, the vehicle had been referred to secondary inspection at the border,[1] but no contraband was

---

[1] At the evidentiary hearing, Agent Rivera testified that "secondary referral" means "the car was subjected to extra scrutiny" at the border, usually in the form an X-ray, hand search, or canine sniff.

ever discovered. Agent Rivera testified that the recent secondary referrals raised his suspicion because, in his experience, drug organizations often will "burn the car." "Burning the car" refers to a vehicle crossing the border several times without contraband to develop a clean crossing history.

Agent Aguayo also searched a database and determined Raygoza-Garcia was not the same person who had driven the Neon across the border that morning. The Agents declared that switching drivers was a drug smuggling operations tactic.

## B.  The Dodge Neon's Movement

The evidence regarding the Dodge Neon's movements was unclear and a contested issue at the evidentiary hearing. In their declarations, the Agents stated the driver slowed down as the Agents followed the Neon. The Agents stated that while following the vehicle from about ten car-lengths behind, they saw the vehicle drift from the second lane on the right to the lane on the far left multiple times. At the evidentiary hearing, Agent Rivera characterized the Neon's movement in a number of ways. He stated that the car was "drifting," made an "an abrupt change," was "swerving back and forth," and was "jerking," and he also stated "[a]t one point, [Raygoza-Garcia] changed lanes. I can't recall."

The Agents drew inferences from the vehicle's movement. In their declarations, the Agents stated that in their experience, swerving indicated the driver was focused on the Border Patrol vehicle rather than the road, and the Agents had seen smugglers behave this way multiple times. At the evidentiary hearing, Agent Rivera first stated that the driver, Raygoza-Garcia, *was paying* attention to the Agents, which led to the driver's swerving that Agent Rivera found

suspicious. Agent Rivera later testified that Raygoza-Garcia *was not* paying attention to the Agents, which Agent Rivera found more suspicious. Raygoza-Garcia testified that he never changed lanes while the Agents were following him.

The Agents continued to follow the Dodge Neon from about two car-lengths behind. At some point, the Agents passed a marked Riverside County Sheriff's vehicle parked near a ramp on the I-15. The Agents stated that they then saw the driver of the Dodge Neon "grip the steering wheel with both hands and reduce his speed to 45–50 miles per hour." The Agents stated this was a sign of nervousness that smugglers exhibit.

The Agents then initiated a vehicle stop. Raygoza-Garcia gave consent for the Agents to conduct a canine sniff and search the car. The search yielded packages of methamphetamine and heroin.

## C.  Evidence of the Key and the Keychain

The Agents, in their initial declarations, stated that they saw a single key in the ignition of the Neon, "without a keychain or additional keys attached to it." The Agents stated that drug smuggling operations frequently provide smugglers with only the key necessary for the vehicle and that the Agents had apprehended "multiple smugglers in vehicles with only one key in the ignition." However, about six months later, the Agents submitted amended declarations. In their amended declarations, they stated that their previous statements "[were] an incorrect recollection made at the time of the declaration," and "[a]fter recently reviewing reports and photos from the case, [they] now recall that there was a single key in the ignition *with* a keychain." The key to the Dodge Neon was attached to a silver fish-shaped keychain.

At the evidentiary hearing, defense counsel cross-examined Agent Aguayo about the keychain inconsistency. Agent Aguyao went back and forth on whether he in fact had a clear view of the key in the ignition of the Neon. He stated that he could not recall whether or not he initially noticed a keychain. Agent Aguayo testified that what mattered to him was the existence of a single key, not whether or not there was a keychain.

## D.  Evidence of Other Stops

The defendant also challenges the district court's decision to not consider evidence of other stops by the Murrieta Border Patrol Station. At the motion to suppress hearing, defense counsel introduced a table showing other recent Murrieta Border Patrol Station stops that Border Patrol Special Agent Bradley Rice created and provided. The data showed about 200 other Murrieta Border Patrol Station stops based on dispatch operation transmissions from the weeks surrounding Raygoza-Garcia's stop. Agent Rice was not aware of any of those stops resulting in referral for federal prosecution. Defense counsel also proffered that in his search of the court docket on PACER,[2] he could find no Murrieta Border Patrol Station stops that led to federal prosecutions.

Defense counsel asked the district court to take judicial notice of the other stops from Agent Rice and the PACER search, characterizing the stops as "unproductive" stops, because they did not result in prosecution. Counsel argued that this evidence showed that Murrieta Border Patrol Station agents were often making stops not supported by

---

[2] PACER stands for public access to court electronic records. The PACER service provides online access to district court records.

reasonable suspicion. The district court found there was a lack of clarity regarding whether the information from Agent Rice and defense counsel was complete in scope and whether any of those stops resulted in state prosecutions. Because of the questions regarding the accuracy and scope of the data, the district court did not take judicial notice of the evidence.

## E.  The District Court's Order

The district court denied Raygoza-Garcia's motion to suppress. The court relied heavily on Agents Rivera and Aguayo's thirteen and six years of experience, respectively, as Border Patrol Agents, and their significant experience in investigating drug smuggling, in reaching its decision. The court found that the Agents' experience and the facts surrounding the stop provided a particularized and objective basis for suspecting Raygoza-Garcia of criminal activity, which constituted reasonable suspicion.

The district court noted concern with the Agents' credibility regarding their testimony about the "single key." The court questioned whether the Agents did in fact have a clear view of the "single key," "because the fish-shaped keychain is slender and silver, and looks like a key itself." "If the Agents did not remember seeing this large keychain, it is certainly questionable whether they could remember seeing other keys on the keyring before stopping the Neon." Accordingly, the court found the single key factor only moderately probative of the Agents' suspicions.

The district court also discussed the disputed issue of Raygoza-Garcia's driving behavior. The court found the Agents more credible and assigned more probative value to their testimony regarding driving behavior. The district court

then concluded there was reasonable suspicion and denied the motion to suppress.

## II.

### A.  Reasonable Suspicion

This court reviews reasonable suspicion determinations *de novo*. *United States v. Valdes-Vega*, 738 F.3d 1074, 1077 (9th Cir. 2013) (en banc). We review the district court's finding of facts for clear error and give "due weight" to the court's and officer's inferences drawn from those facts. *Id.* "We thus apply 'a peculiar sort of *de novo* review,' *United States v. Arvizu*, 534 U.S. 266, 278, 122 S. Ct. 744, 151 L.Ed.2d 740 (2002) (Scalia, J., concurring), slightly more circumscribed than usual, because we defer to the inferences drawn by the district court and the officers on the scene, not just the district court's factual findings." *Id.* (citations omitted).

Raygoza-Garcia argues that the Agents' stop of his vehicle violated his Fourth Amendment right to be free from unreasonable seizures. We hold that the stop was lawful and the district court did not err in denying Raygoza-Garcia's motion to suppress.

Border Patrol Agents on roving border patrols may conduct "brief investigatory stops" without violating the Fourth Amendment if the stop is supported by reasonable suspicion to believe that criminal activity may be afoot. *Id.* at 1078. "Reasonable suspicion is defined as a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* (internal quotations and citation omitted). The standard "is not a particularly high threshold to reach," and "[a]lthough . . . a mere hunch is insufficient to justify a stop, the likelihood of criminal

activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id*.

When determining whether there was reasonable suspicion, we "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (internal quotations and citation omitted). This approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Valdes-Vega*, 738 F.3d at 1078 (internal quotations and citation omitted). A "divide-and-conquer analysis" is not appropriate, because although one's acts might be innocent when viewed in isolation, taken together, the acts may warrant further investigation. *Id*.

When evaluating law enforcement stops of vehicles near the border, "the totality of the circumstances may include characteristics of the area, proximity to the border, usual patterns of traffic and time of day, previous alien or drug smuggling in the area, behavior of the driver, appearance or behavior of passengers, and the model and appearance of the vehicle." *Id*. at 1079 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 884–85 (1975)). The facts in a given case must be seen through the lens of the agents' training and experience. *Id*.

Here, we conclude that the Agents had a particularized and objective basis for suspecting that Raygoza-Garcia was engaged in criminal activity. *See id*. at 1078. The district court's findings of fact were not clearly erroneous, and reviewing the facts under the totality of the circumstances,

they supported a determination of reasonable suspicion. *See id*. at 1079.

The Agents here had thirteen and six years of experience, respectively, as Border Patrol Agents, and they had experience investigating drug smuggling operations. We defer to the Agents' observations and inferences from their observations based on their experience. *See id*. The Agents noted factors including the change from the Dodge Neon's morning driver to Raygoza-Garcia later on the same day, a practice the Agents found related to drug smuggling operations. The Agents also considered the vehicle's recent crossing history, which they noted could suggest the use of a tactic to establish a clean record for the vehicle. The Agents stated they learned about these techniques in their experience as Border Patrol Agents.

In addition, we defer to the district court's findings of fact regarding Raygoza-Garcia's driving behavior. The district court found the Agents more credible than Raygoza-Garcia on this issue, and there is no reason to believe that the district court's credibility findings were clearly erroneous. *See id*. at 1079.

However, in reaching the reasonable suspicion determination, the Agents also noted factors that would apply to a vast number of drivers and the law-abiding population. These factors include conduct that is innocent or innocuous on its own or when looked at in isolation. But, "to establish reasonable suspicion, an officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the lawabiding population." *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006).

Here, Raygoza-Garcia was driving about 70 miles from the border on the I-15, a busy highway, in moderate to heavy

traffic. Unlike *Valdes-Vega*, where the defendant was erratically driving by excessively speeding, changing lanes frequently, and weaving in and out of traffic to evade law enforcement, the Agents here observed Raygoza-Garcia slow down several times and drift between lanes. *See Valdes-Vega*, 738 F.3d at 1079–80. The Agents found the reduction in speed suspicious and associated with the behavior of drug smugglers. Slowing down on a busy highway about 70 miles from the border after seeing law enforcement is not suspicious on its own and "would cast suspicion on large segments of the lawabiding population." *Manzo-Jurado*, 457 F.3d at 935. In addition, crossing the United States-Mexico border with a Mexican license plate and having a prior crossing history in which no contraband was found are factors that could apply to many individuals that drive across the United States-Mexico border. Still, we consider the factors under the totality of the circumstances, and even though individual acts may be "innocent in [themselves] . . . taken together, they [may] warrant[] further investigation." *Valdes-Vega*, 738 F.3d at 1078 (first alteration added, subsequent alterations in original) (internal quotations and citation omitted).

Looking to the facts in this case, they show that the Agents had significant experience and determined, based on that experience, that a number of factors, including the vehicle's recent crossing history, the change in drivers on the same day, the distracted driving, and the proximity of the vehicle to the border, all indicated the possibility of drug smuggling activity. The district court also heard testimony from the Agents and Raygoza-Garcia and assessed their credibility. Given the totality of the circumstances and giving due weight to the Agents' observations and the district court's factual findings, we hold that the Agents had reasonable suspicion to stop Raygoza-Garcia.

## B. Evidence of Other Murrieta Border Patrol Station Stops

Raygoza-Garcia also argues that this court should consider the evidence he presented of other stops along the I-15 and defense counsel's PACER search for similar cases to Raygoza-Garcia's. In the alternative, Raygoza-Garcia asks us to hold that the district court erred in not considering the evidence of the other stops and to remand for the district court to take judicial notice of the evidence. Raygoza-Garcia argues that the evidence of the "unproductive stops," or stops from which no federal prosecutions arose, shows the Murrieta Border Patrol Station agents were not properly applying the reasonable suspicion standard.

A court may take judicial notice of undisputed matters of public record, which may include court records available through PACER. *See* Fed. R. Evid. 201(b); *United States v. Howard*, 381 F.3d 873, 876 n.1 (9th Cir. 2004) (taking judicial notice of facts regarding the suppression hearing from the district court record in the underlying criminal case). Here, Raygoza-Garcia asks this court to not only consider the evidence of the existence of the other stops, but also draw inferences from the data contained therein. We decline to do so. There is insufficient evidence to support the assertion that from defense counsel's search of PACER and the Murrieta Border Patrol Station data, agents have broadly misapplied the reasonable suspicion standard. In addition, the evidence Raygoza-Garcia points to is neither "generally known within the trial court's territorial jurisdiction" nor "can [it] be accurately and readily determined from sources whose accuracy cannot be reasonably questioned" as required under Federal Rule of Evidence 201(b). Accordingly, Raygoza-Garcia's evidence does not constitute facts that are not subject to reasonable dispute, and they are

not the proper subject of judicial notice. *See* Fed. R. Evid. 201(b). We therefore reject Raygoza-Garcia's argument that we must consider the evidence of other stops or remand for the district court to take judicial notice of the evidence.

In sum, we hold that under the totality of the circumstances, there was reasonable suspicion that criminal activity was afoot, and the Agents stop of Raygoza-Garcia was lawful.

**AFFIRMED.**

MURGUIA, Circuit Judge, and ZOUHARY, District Judge, specially concurring:

We write separately because although we are bound by our decision in *Valdes-Vega*, we have concerns about how we review reasonable suspicion determinations near the border.

Reasonable suspicion, while "not a particularly high threshold to reach," must still mean something. *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc). There must be "a particularized and objective basis for suspecting the *particular* person stopped of criminal activity." *Id.* (emphasis added). This particularized standard is not met when an officer relies solely on generalizations that affect large segments of the law-abiding population. Such generalizations do not indicate criminality, but rather show innocent conduct. *See United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006). "Seemingly innocuous behavior does not justify an investigatory stop unless it is combined with other circumstances that tend cumulatively to indicate criminal activity." *Id.* While *Valdes-Vega*

cautions against a "divide-and-conquer" approach of factors leading to reasonable suspicion, *see Valdes-Vega*, 738 F.3d at 1078, we must pay close attention to officers' reliance on innocuous conduct, *see Manzo-Jurado*, 457 F.3d at 935.

There are limits on our deference to an officer's inferences. Courts "will defer to officers' inferences only when such inferences rationally explain how the objective circumstances 'arouse[d] a reasonable suspicion that *the particular person being stopped* ha[d] committed or [was] about to commit a crime.'" *Manzo-Jurado*, 457 F.3d at 934–35 (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)) (alteration and emphasis in original). "[W]hile an officer may evaluate the facts supporting reasonable suspicion in light of his experience, experience may not be used to give the officers unbridled discretion in making a stop." *Id*. (quoting *Montero-Camargo*, 208 F.3d at 1131).

In this case, in reaching their reasonable suspicion determination, several factors the Agents relied upon were innocent conduct or innocuous circumstances that could apply to a large segment of the law-abiding population driving in Southern California. For example, driving 70 miles from the United States-Mexico border on a major highway, crossing at the Otay Mesa port of entry, and having a Mexican license plate do not support reasonable suspicion. Those factors are not particularized. *See Valdes-Vega*, 738 F.3d at 1081 (Pregerson, dissenting). First, as the Agents noted, the I-15 is a heavily trafficked interstate and major north-south highway in California. Second, thousands of individuals cross the border every day, and the Otay Mesa port of entry saw nearly 7 million personal vehicles and over

12 million passengers in vehicles cross in 2014.**[1]** This translates to approximately 19,000 vehicle crossings per day. Third, it is common for many Mexican nationals, including those with Mexican license plates, to travel frequently between the United States and Mexico. As an illustration of this, in 2014, 1.2 million Border Crossing Card visas were issued to Mexican nationals.**[2]**

In addition, though not cited as a factor by the Agents here, we have held that where a large portion of the area's population is Latino, officers cannot rely on an individual's apparent Latino appearance in making a reasonable suspicion determination because one's ethnicity or race is not sufficiently particularized to indicate the criminality of a particular person. *Manzo-Jurado*, 457 F.3d at 935 n.6 (citing

---

[1] U.S. Department of Transportation, Bureau of Transportation Statistics, Border Crossing/Entry Data, https://explore.dot.gov/t/BTS/views/BTSBorderCrossingAnnualData/BorderCrossingTableDashboard?:embed=y&:showShareOptions=true&:display_count=no&:showVizHome=no (last visited August 21, 2018). In 2017, approximately 8.3 million personal vehicles and 13.6 million personal vehicle passengers crossed through that port of entry. *Id.*

[2] In 2015, 2016, and 2017, over one million such visas were issued each year. The number of visas are recorded by fiscal year. *See* U.S. Department of State, Nonimmigrant Visa Statistics, Nonimmigrant Visas Issued by Classification (Including Border Crossing Cards), https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2017AnnualReport/FY17AnnualReport-TableXVIB.pdf (last visited August 21, 2018). NIV Detail Tables by year show that B1/B2/ Border Crossing Cards are only issued to those from Mexico. *See, e.g.*, FY2014 NIV Detail Table, https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY14NIVDetailTable.pdf (last visited August 21, 2018); *see also* U.S. Department of State, Border Crossing Card, https://travel.state.gov/content/travel/en/us-visas/tourism-visit/border-crossing-card.html (last visited August 21, 2018).

*Montero-Camargo*, 208 F.3d at 1132). Latinos make up almost 40% of California's population[3] and over 30% of San Diego County.[4] Given the large Latino population in the relevant area, Hispanic appearance is also not a particularized factor here. *See id.*

The particularity requirement is undermined if officers can rely on such generalized factors, and courts in turn defer to officers' inferences. Reliance on seemingly innocuous conduct or factors can create a system that disproportionately affects Latinos and that, in effect, allows racially-motivated stops.

Faced with similar facts as those here, the dissent in *Valdes-Vega* noted that the defendant's Hispanic appearance played a role in the stop, although the agents did not acknowledge that they considered his appearance. *See Valdes-Vega*, 738 F.3d at 1081 (Pregerson, dissenting). The dissent conveys that ethnicity or race may play an unstated role and, in the facts of that case, should not have been a particularized basis upon which to find reasonable suspicion. While the role of ethnicity or race may be unstated, "it is no secret that people of color are disproportionate victims of [law enforcement] scrutiny." *Utah v. Strieff*, 136 S. Ct. 2056, 2070 (2016) (Sotomayor, dissenting). Courts must be mindful that when officers rely on innocuous factors that may disproportionately apply to Latinos, or other persons of

---

[3] United States Census Bureau, Quick Facts, California, 2016, https://www.census.gov/quickfacts/CA (last visited August 21, 2018).

[4] United States Census Bureau, 2012–2016 American Community Survey 5-Year Estimates, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/16_5YR/S0501/0500000US06073 (last visited August 21, 2018).

color, we may be making room for racial bias—whether it be explicit or implicit—to play a role.

While we defer to officers, courts must still evaluate the probative value of any innocuous conduct that officers relied upon. *Valdes-Vega*, 738 F.3d at 1081 (Reinhardt, dissenting) (noting and distinguishing the innocent acts in *Valdes-Vega* from those in *Arvizu*). "Not all acts are equal, and not all innocent acts are suspicious." *Id*. We only defer to inferences about innocent or innocuous conduct where those inferences rationally explain how the objective circumstances aroused a reasonable suspicion that a defendant had committed a crime. *See Manzo-Jurado*, 457 F.3d at 934–35.

While not overwhelming, there were sufficient non-innocent and particularized factors here to support the stop of Raygoza-Garcia. The Agents specifically noted that Raygoza-Garcia was not the person who drove the vehicle across the border that morning; the drivers had switched. The Agents also noted the vehicle's recent crossing history in a compressed time period. In their declarations, the Agents here stated that the tactic of switching drivers after a "contraband load vehicle has crossed the border" is a tactic of drug smuggling operations along the I-15 corridor. One Agent also testified that, in his experience, drug organizations cross a car multiple times in a short time period without drugs to develop a "clean" crossing history, before attempting the contraband load. These factors are probative.

However, there was little probative value to several of the other factors the Agents relied upon. Here, the Agents inferred that nearly everything Raygoza-Garcia did showed that he was part of a drug smuggling operation. For example, not looking at the Agents was suspicious, and then paying attention to the Agents was suspicious. Gripping the wheel

with rigid posture was suspicious. Yet much of the general population might exhibit similar behavior when encountering law enforcement. Innocuous conduct like this has no probative value.

Moreover, the Agents' credibility was at issue here. The Agents backtracked from their initial testimony that they clearly saw a single key in the ignition, with no keychain or other keys, which the Agents testified was an indication of drug smuggling operations. The Agents claimed to have a better recollection, albeit after viewing the evidence in the case, and their amended declarations stated there *was* a keychain along with the key. At the evidentiary hearing, Agent Aguayo testified he couldn't really remember what he saw regarding the key. We need not defer to officers where credibility issues like this cast doubt on the reasonable suspicion determination. *See Manzo-Jurado*, 457 F.3d at 935. In some cases the officer's credibility could permeate the totality of the factors relied upon. Here, the district court had some doubts, and appropriately chose not to rely on the "single key" evidence.

In sum, law enforcement may not support a stop using innocent conduct, in and of itself. Because many of these factors may disproportionately apply to the Latino population, as they did here, there is a risk of sanctioning race- or ethnicity-based stops. Given the particularity of certain relevant and probative factors the agents relied upon in this case, and in accordance with *Valdes-Vega*, we do concur. However, officers' inferences must rationally explain how innocuous conduct and factors establish reasonable suspicion as to the particular person being stopped to avoid stops that might be interpreted as premised on race or ethnicity.