**NOT FOR PUBLICATION**

**FILED**

UNITED STATES COURT OF APPEALS

DEC 21 2021

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 20-50354 |
| Plaintiff-Appellee, | D.C. No. 3:19-cr-05229-CAB-1 |
| v. | |
| LUIS STEPHEN HARO, | MEMORANDUM[*] |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Southern District of California
Cathy Ann Bencivengo, District Judge, Presiding

Submitted December 9, 2021
Pasadena, California

Before: KELLY,[**] M. SMITH, and FORREST, Circuit Judges.

Defendant Luis Stephen Haro was convicted after a bench trial of illegally transporting an alien in violation of 8 U.S.C. § 1324(a)(A)(ii). On appeal, he argues that the district court erred by: (1) denying his motion to suppress evidence because the border patrol agents lacked reasonable suspicion to stop his car; (2) finding him

---

[*]    This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**]    The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

guilty when the government offered insufficient evidence of his intent to illegally transport an alien; and (3) admitting Alejandro Vieyra-Manriquez's deposition testimony as evidence at trial because it violated his rights under the Confrontation Clause.

We review each of the issues Haro raises de novo. *United States v. Valdes-Vega*, 738 F.3d 1074, 1077 (9th Cir. 2013); *United States v. Liew*, 856 F.3d 585, 596 (9th Cir. 2017); *United States v. Rodriguez*, 880 F.3d 1151, 1166 (9th Cir. 2018). We affirm.

**1. *Reasonable Suspicion.*** Border patrol officers had reasonable suspicion for the stop under the totality of the circumstances. *See Valdes-Vega*, 738 F.3d at 1078. After twice observing Haro—a known alien smuggler and gang member—driving a white Ford Fiesta in loops around Calexico while talking on his phone and looking around suspiciously, a border patrol agent placed an alert on Haro's car because he believed that it would later be used for alien smuggling. *See United States v. Raygoza-Garcia*, 902 F.3d 994, 1000 (9th Cir. 2018); *Valdes-Vega*, 738 F.3d at 1079.

A few weeks later, the alert was triggered when Haro's car began traveling westbound along Interstate 8, a high traffic area for smuggling, only thirty minutes after the border checkpoint closed, which is a common time to travel for alien smugglers trying to avoid detection. The same agent who placed the alert issued a

Be-On-The-Lookout (BOLO) to the San Diego border patrol sector for "a white Ford Fiesta, possibly involved in alien smuggling" driven by a "known gang member." The agent who received the BOLO observed Haro and Vieyra-Manriquez in the car staring forward without talking which, in his experience, is common conduct between a smuggler and a transported alien. The agent also believed he saw someone lying down in the back of the car. *See Heien v. North Carolina*, 574 U.S. 54, 61 (9th Cir. 2014) (holding that reasonable suspicion can be premised on a reasonable mistake of fact). Finally, the agent observed Haro slam his fist on the steering wheel in frustration when the agent made eye contact with him.[1]

Although some of Haro's conduct was "innocent or innocuous" on its own, viewed under the totality of the circumstances, the closed checkpoint, proximity to the border, BOLO alert, and the agent's specific observations provided "a particularized and objective basis" for the stop. *Raygoza-Garcia*, 902 F.3d at 1000.

**2.** ***Sufficiency of the Evidence.*** In assessing whether there was sufficient evidence to convict Haro for violating 8 U.S.C. § 1324(a)(A)(ii), we "view[] the

---

[1]Although Haro argues that this final act was contradicted by Vieyra-Manriquez's testimony that Haro did not slam his fist until after the arresting agent activated his sirens, Vieyra-Manriquez's deposition does not clearly state that Haro did not slam his fist beforehand. Moreover, Vieyra-Manriquez told a private investigator that "when the Border Patrol was driving behind the[] vehicle," Haro did "hit the steering wheel with his hand . . . like he was going to cry." The district court found that, while he "might [have] overstated" it, the arresting agent saw Haro slam his fist before he activated his sirens. This finding is not clearly erroneous. *Valdes-Vega*, 738 F.3d at 1077.

3

evidence in the light most favorable to the prosecution" to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Magallon-Jimenez*, 219 F.3d 1109, 1112 (9th Cir. 2000) (applying this standard to bench trials).

Here, when viewed in favor of the prosecution, the evidence established that Haro knew Vieyra-Manriquez entered the United States illegally and that he set out to transport Vieyra-Manriquez to San Bernadino in furtherance of him remaining in the country illegally. *See* 8 U.S.C. § 1324(a)(A)(ii); *see also* Ninth Cir. Crim. Model Jury Instr. 9.2 (requiring a mens rea of "knowledge" for the "in furtherance of" element). The district court correctly understood the requisite mens rea and necessarily concluded it was met when it found that "Haro was driving [Vieyra-Manriquez] to San Bernardino in order for him to remain in the United States to work."

**3.** *Confrontation Clause.* The district court did not err in concluding that the government made good faith, reasonable efforts to locate Vieyra-Manriquez to testify at trial. During Vieyra-Manriquez's deposition, the government informed him that he was obligated to return to the United States, his travel expenses would be paid, and he would be given a parole letter to enter the United States. About a month before trial, the government provided Vieyra-Manriquez's attorney with a parole letter and travel information after counsel stated that he could contact Vieyra-

4

Manriquez. Then, when the government learned that Vieyra-Manriquez was not in contact with his attorney, it ran records checks, placed investigative alerts, searched social media, contacted the Mexican government, and asked Vieyra-Manriquez's counsel for contact information for Vieyra-Manriquez or his wife. *See* 8 U.S.C. § 1324(a); *Rodriguez*, 880 F.3d at 1166. Although the government did not keep Vieyra-Manriquez in custody after his subsequent illegal entries, Haro did not have a trial date set at the time of those events and Vieyra-Manriquez was released in accordance with then-current COVID-19 procedures. *See* 42 U.S.C. § 265.

We further conclude that the government did not violate *Brady* in disclosing Vieyra-Manriquez's later arrests. To establish a *Brady* violation, a defendant must show that the evidence was "exculpatory or impeaching" and "material." *United States v. Houston*, 648 F.3d 806, 813 (9th Cir. 2011) (quoting *United States v. Antonakeas*, 255 F.3d 714, 725 (9th Cir. 2001)). Haro primarily makes vague assertions that Vieyra-Manriquez "may have been lying." But even if we were to consider his more specific examples raised for the first time in reply of how he would have used Vieyra-Manriquez's subsequent arrests to impeach Vieyra-Manriquez, we are not persuaded that any use of this information would have been material.

**AFFIRMED.**